COMMONWEALTH *vs.* STEPHEN B. JONES.

Suffolk.   December 18, 1979. — January 23, 1980.

Present: BROWN, GREANEY, & PERRETTA, JJ.

*Identification.  Evidence,* Acceptance or rejection of testimony.

In a proceeding on a motion to suppress from evidence, as impermissibly suggestive, a rape victim's selection of a photograph of the defendant as her assailant from an array of seven photographs appearing on hackney licenses, the judge's finding that the defendant's license was conspicuous because it displayed his name when the others did not was clearly erroneous, in the absense of evidence that the defendant's name had ever been brought to the victim's attention. [89-90]

In a proceeding on a motion to suppress from evidence a rape victim's identification of a photograph of the defendant as her assailant neither the judge's disbelief of uncontradicted testimony that the array of photographs from which the victim made her identification was fairly selected, that she had not seen the defendant's name previously and that her selection was the product of her independent choice, nor the circumstantial evidence that the victim's son, a police officer who resided with her, knew of the general progress of the investigation, warranted the judge's conclusion that the victim's son had forewarned his mother that the defendant's picture would be in the array or the judge's suggestion that the son, who was nearby when the victim made her selection, subliminally guided her choice. [90-91]

A judge erred in allowing a motion to suppress a victim's proposed in-court identification of a defendant charged with rape, notwithstanding the fact that vigorous questioning had introduced some doubt into her identification, where the victim at no point firmly renounced her identification and the evidence did not support the judge's conclusion that the defendant's presence in the dock was the sole ground for her identification. [92-93]

INDICTMENT found and returned in the Superior Court Department on September 21, 1978.

A pretrial motion to suppress evidence was heard by *Spring,* J.

The Commonwealth's application for an interlocutory appeal was allowed in the Supreme Judicial Court for the county of Suffolk by *Liacos, J.*, and was reported by him to the Appeals Court.

*Stephen M. Needle,* Assistant District Attorney, for the Commonwealth.

*Ralph C. Martin, II,* for the defendant.

GREANEY, J.  On August 31, 1978, at approximately 9:00 A.M., an apartment in Roxbury was entered by a black male wearing a ski hat with a nylon stocking partially covering his face.  This male proceeded to rape, rob and severely beat the apartment's occupant, a fifty-seven year old woman.  As he left, the assailant set fire to the apartment. Stephen B. Jones was subsequently indicted for seven major crimes.[1]  He filed a pretrial motion to suppress out-of-court and proposed in-court identifications by the victim.[2]  Following a hearing at which the victim and a police detective testified in detail, a Superior Court judge made findings and rulings and ordered the identifications suppressed.  The Commonwealth was permitted an interlocutory appeal (G. L. c. 278, § 28E), and that appeal has been transferred here (G. L. c. 211, § 4A).  We reverse.

The following is a summary of the relevant evidence at the hearing on the motion.  Shortly after the crimes had occurred, Detective Emmet F. McNamara, attached to Dis-

---

[1] Breaking and entering with intent to commit a felony and putting a person in fear, unarmed robbery, assault and battery, assault by means of a dangerous weapon, assault with intent to commit murder, two counts of forcible rape, and arson.

[2] The motion sought to suppress out-of-court identifications by the victim made from the defendant's picture on a hackney license and from an application by the defendant for a Massachusetts driver's license.  That part of the motion questioning the identification from the driver's license application was not pressed before the judge and is considered waived. In addition to arguing that the identification made from the hackney license was impermissibly suggestive, the defendant also asserted in his motion that the identification derived from statements taken by police in violation of his constitutional rights.  This last ground was not adequately pursued before the judge, no findings or rulings were made thereon, and it is also considered waived in so far as this motion is concerned.

trict 2, received information that the assailant was a black male, in his twenties, about five feet ten inches tall, weighing approximately 150 pounds and wearing a striped ski hat.[3]  At the scene the detective ascertained the assailant's escape route down a nearby dirt road.  On the road a ski hat containing a rolled up lady's stocking was discovered.  A closer look at the hat revealed a piece of tape inside bearing the printed name of Stephen Jones.  Pursuing this lead, the detective ascertained that two black males with the name of Stephen Jones, one of whom was the defendant, lived in the vicinity of the victim's apartment.  A visit to the victim at the hospital produced a positive identification of the ski hat as that worn by her assailant ("That's the hat"), and an identification of the stocking as resembling the one covering her attacker's face.  The demonstrative tape in the hat was not brought to the victim's attention, nor did she independently observe it when she examined the hat.  The detective next assembled several mugshot photographs of black males for viewing by the victim.  The defendant's picture was not among this array; a photograph of the other Stephen Jones was.  She rejected all the photographs and in particular rejected the photo of the other Jones as "too dark skinned."

Prime attention now focused on the defendant.  Upon discovering that he had once held a hackney license, the detective assembled a new array consisting of seven hackney licenses owned by black males, including one belonging to the defendant.  This gallery was shown to the victim on September 8, 1978, at her son's apartment.  She positively and unequivocally identified the picture on the defendant's license as that of her assailant[4] ("This is the man").  During

---

[3] This information was obtained from another police officer.  An incident report completed after the start of the investigation indicated that the suspect was a black male, six feet tall, weighing 170 pounds, and wearing a black stocking cap with orange stripes.  This information in the incident report presumably came from the victim.

[4] The detective testified that he told the victim that he had some additional photographs for her examination.  The hackney licenses were placed on a table before her face down and she examined all of them.  She

this viewing the detective avoided mention of the defendant's name and eschewed any action, gesture or comment that might tend to highlight or distinguish the defendant's license from the other six. The victim was also not made privy to information that the defendant had been interviewed at the police station and had supplied handwriting and hair samples for expert analysis.

Following release from the hospital, the victim went to live with her son, a Boston police officer. Although he knew that the defendant was a suspect and that Jones' picture would be among the second array, his mother testified that no communications had ever been exchanged between them as to either fact. During the procedure that produced the identification, the son was dispatched to the kitchen by Detective McNamara, where he could see what was going on but could not comment thereon.[5]

The victim testified that the criminal incidents spanned a thirty to forty-five minute period during which she viewed the attacker's face at a distance for ten to fifteen minutes,[6] and close up for five to ten minutes in the light of a nearby bedroom table lamp. Her description of the assailant before the judge was quite full — he was a black male, five feet nine to five feet ten inches tall,[7] with brownish eyes wearing a white tee shirt, beige pants, blue sneakers and a

---

then selected one license, called the officer's attention to it, and stated that this photograph depicted her assailant. The picture on that license was the defendant's. During the procedure she was nervous, upset and embarrassed, but, according to the officer "she knew what she was doing."

[5] The detective testified that he made a point of telling the victim's son that he wanted the victim to look at the pictures alone. The son did not look at any of the photographs prior to his mother's inspecting them, and the son remained in the kitchen during the entire procedure where he "possibly" could have seen what was going on.

[6] At some points in the series of attacks the assailant had removed the ski cap. The victim testified that when she saw her assailant close up he had pushed the stocking mask up over his eyebrows so that it covered only his forehead.

[7] She gauged his height as a few inches taller than her own, which was approximately five feet five inches.

blue ski cap with yellowish stripes. She particularly emphasized that her attacker was a light skinned Negro person with "big lips" and a "big nose." She repeated that her positive identification of the hat was without knowledge or sight of the name inside. The defendant's name meant nothing to her, and she firmly disclaimed that any efforts, direct or indirect, had been made by the police or her son to alert her to the defendant's status in the investigation or otherwise to steer her to his picture in the second display.[8]

Her courtroom identification wavered. She was first "sure" that the defendant was her assailant because of his eyes; then she testified that the defendant "looks like him," "something like him" or "resembles him." At other junctures in her examination she testified that she recognized the defendant because he was in the dock, that she was unsure about his eyes, and that she was "doubtful now."

Based essentially on this evidence, the judge found that the victim did not have an adequate opportunity to view her attacker so as to fix his features in her mind. He found that, because the victim had been living with her son after the attack and because the son had some knowledge of the investigation's progress, a substantial likelihood existed that the defendant's identity had been communicated to the victim in advance of her selection of the picture. He determined that the photographic identification procedure was impermissibly suggestive because of this assumed preknowledge on the victim's part and because the defendant's name was conspicuous on the face of the license when "none of the other photographs had any identification on them." The judge ultimately concluded that the out-of-court identification was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification and that the in-court

---

[8] She stated several times in the course of her testimony that she had not been made aware of the defendant's name or that his picture might be in the group of licenses shown to her at her son's apartment. She testified that she learned the defendant's name for the first time when she appeared before the grand jury. Apparently nothing occurred prior to her grand jury appearance which impressed his name on her.

identification was based on the defendant's presence in the dock without an authenticating independent source.

In the context before us, a challenge to identifications as constitutionally suspect requires at the outset a showing by the defendant that the witness was subjected by the police to a pretrial confrontation, "'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to deny the defendant due process of law." *Commonwealth* v. *Venios,* 378 Mass. 24, 27 (1979), quoting from *Commonwealth* v. *Botelho,* 369 Mass. 860, 865-868 (1976). The factual search for unnecessary suggestiveness is to be made in light of "the totality of the circumstances" surrounding the questioned procedure. *Stovall* v. *Denno,* 388 U.S. 293, 302 (1967). Our function in review of this type of case is to consider whether the evidence supports the judge's findings of fact, due respect being accorded to his superior opportunity to observe and weigh the testimony; then we are to ascertain whether the findings justify the judge's decision in law.[9] *Commonwealth* v. *Murphy,* 362 Mass. 542, 547 (1972). *Commonwealth* v. *Stanley,* 363 Mass. 102, 104 (1973). *Commonwealth* v. *Botelho,* 369 Mass. 860, 868 (1976).

With respect to the victim's photographic identification on September 8, 1978, the judge ruled that the procedure employed was impermissibly suggestive. That ruling in

---

[9] The standard of appellate review in these cases has been nicely summarized in slightly different terms by the Supreme Judicial Court of Maine in *State* v. *Cefalo,* 396 A.2d 233, 239-240 (Me. 1979) in this fashion: "[T]he lower court's resolution of [identification] issues requires two steps. First, the trial judge must find 'historical facts,' i.e., facts 'in the sense of a recital of external events and the credibility of their narrators' [quoting from *Brown* v. *Allen,* 344 U.S. 443, 506 (1953)]. Second, he must draw legal conclusions from these facts . . . . [T]he [appellate] court affords his findings of historical fact considerable deference . . . . Moreover, the [appellate] court has a special responsibility to exercise its independent judgment to determine the validity of legal conclusions that are dispositive of [the] claim . . . . [A] trial judge's findings of historical facts on relevant identification issues will be overturned only when clearly erroneous. The legal conclusions drawn from those facts, however, are subject to the independent examination and judgment of the [appellate] court."

turn is essentially derived from three groups of factual find-
ings which may be summarized as follows: (1) that the
police presented the seven-license array with only the de-
fendant's license and none other bearing the conspicuous
display of a name; (2) that during the viewing the victim's
son was close enough to observe what was going on (suggest-
ing but not finding that he subliminally guided her choice);
and (3) that it was quite probable that the victim's son had
advised his mother that the defendant was her assailant and
that the defendant's photo would be seen in the spread.
These findings are critical to the judge's ultimate result;
none receives adequate support in the evidence.[10]

As to the first, we have before us all seven hackney li-
censes used in the array. They all identically display the
pictures of black males on a small standardized card. Each
also contains the logos of the Boston police department and
the city, the typewritten name and address of the licensee,
his signature, the license number and its expiration date. All
seven licenses are precisely the same in form and the whole
array is a fair, nonsuggestive display of individuals basically
similar in features, ages and general appearance. There is
nothing in the composition of the display which tends to
dramatize the defendant or to single out his license or pic-
ture from the others. The array was assembled with a cir-
cumspect eye and appears impartial. See *United States* v.
*Lustig,* 555 F.2d 737, 749 (9th Cir. 1977), cert. denied, 434
U.S. 1045 (1978) (array of four or five photos shown to of-
ficers without indication of which was suspect not imper-
missibly suggestive); *United States* v. *Medico,* 557 F.2d 309,

---

[10] The preliminary findings by the judge (leading to these groups of find-
ings) to the effect that the victim did not have an adequate opportunity to
view her attacker during the incident so as to fix his features in her mind are
also not adequately supported in the evidence. The testimony indicates
that she saw him at close range in good light for five to ten minutes with
most of his face uncovered. Her description of the assailant following the
incident, and her later recall of his appearance satisfies us that she had an
adequate opportunity to observe his facial features at the time of the crimes
and to retain his characteristics in her memory for purposes of making a
reliable photographic identification. See note 11, *infra.*

311 (2d Cir.), cert. denied, 434 U.S. 986 (1977) (showing eight photos of white men to each of three witnesses and asking if they recognized any as the robber not suggestive); *United States* v. *Collins,* 559 F.2d 561, 563 (9th Cir.), cert. denied, 434 U.S. 9C7 (1977) (photo array of six with subjects of similar age and like hairstyles not impermissibly suggestive). We therefore conclude that the judge's finding that the defendant's license was conspicuous because it displayed his name when the others did not is clearly erroneous.

The second and third groups of findings are joined for discussion. The judge arrived at them apparently by disbelieving major portions of the testimony of the police detective and the victim to the effect that the defendant had not been selectively targeted for display, and that she had not seen the name in the ski hat, and by concluding from the circumstantial evidence of the son's knowledge of the investigation and his common residence with his mother that she had been advised that the defendant was a suspect and that she had been told to anticipate the presence of the defendant's picture in the group by watching for his name.

Disbelief of the testimony of the victim and Detective McNamara alone would be an unjustified basis for the findings. The substantially uncontradicted testimony of these two witnesses — the only witnesses who testified at the hearing — establishes that the gallery was fairly selected as part of an ongoing process of police investigation and that the victim's ultimate selection of the defendant's picture was the product of her independent choice. There was not a shred of material evidence that her selection was influenced in any way by her son[11] or by any other police officer, and the only evidence in the record as to any knowledge on her part of the defendant's name was that it was disclosed to her for the first time at the grand jury hearing. The judge was not obligated to give credit to this uncontradicted testimony. But it is well settled that "[m]ere disbelief of testimony is not proof of facts of an opposite nature or tendency"

---

[11] Neither side called the victim's son to testify.

(*McDonough* v. *Vozzela*, 247 Mass. 552, 558 [1924]), and that "such disbelief [will] not be [the] equivalent of proof to the contrary." *Carmichael* v. *Carmichael*, 324 Mass. 118, 121 (1949). *Commonwealth* v. *Mahnke*, 368 Mass. 662, 691 (1975) (judge may reject proffered testimony because he does not find it credible, but nonetheless his finding of the reverse must be supported by other relevant evidence).

Nor does the circumstantial evidence warrant the judge's conclusions. Although the process of drawing inferences is capable of bridging many gaps in the proof, the line must be drawn between permissible deduction and unwarranted suspicion. As Chief Justice Shaw classically stated in 1850 in *Commonwealth* v. *Webster*, 5 Cush. 295, 312 (1850), "great care and caution ought to be used in drawing inferences from proved facts . . . [and any inference drawn] must be a fair and natural, and not a forced or artificial conclusion . . . ." See also *Commonwealth* v. *Bonomi*, 335 Mass. 327, 355-356 (1957), and cases cited. All of the evidence in this case pointed to the absence of any corrupting suggestiveness. It does not therefore logically and permissibly follow that because the son, a Boston police officer, permitted his mother to live with his family after the crimes and knew of the general progress of the investigation and the purpose of the second photographic display that he forewarned his mother that the defendant's picture would be in the group. We conclude that the judge made an improper leap of reasoning from inadequate data, and that the circumstantial facts are insufficient to forge a chain of inferences supportive of his ultimate conclusions.

The failure of the defendant to pass the threshold in establishing a constitutional deficiency in procedures is fatal to his claim. *Commonwealth* v. *Chase*, 372 Mass. 736, 745 (1977). Because he has failed to meet his burden, there is no need to analyze extensively the evidence to see if the identifications are rooted in an independent source or whether they remain convincing after an application of the "reliability" formula developed in *Manson* v. *Brathwaite*, 432 U.S.

98, 114 (1977). Suffice it to say that under either standard they remain constitutionally acceptable.[12]

With respect to the proposed in-court identification we find, again looking to the totality of the circumstances (*Manson* v. *Brathwaite,* 432 U.S. 98, 106 n.9 [1977]), that the judge's conclusion declaring it unreliable is clearly wrong. At no time did the victim firmly renounce her selection. Vigorous questioning in the nature of cross-examination brought her from a state of certainty to one of some doubt. To be sure the defendant's presence in the dock was an unsettling influence on her. See generally *Commonwealth* v. *Moore,* 379 Mass. 106, 107-111 (1979). But the evidence does not support the conclusion that his situation in the box was the sole ground of the identification. She was thrown off to some extent by the fact that the defendant in the courtroom was bearded and her assailant's eyes appeared more "slurred" than the defendant's because of the use of the stocking mask. The goal of the process does not require extirpation of all appearances of doubt. The goal is to ensure that the accused receives a fair trial by not being exposed to an identification which is inherently unreliable or which derives from governmental misconduct at its inception. *Commonwealth* v. *Wheeler,* 3 Mass. App. Ct. 387, 392 (1975). Because the prohibited line of substantial likelihood of irreparable misidentification was not passed in this case it therefore remained "for the jury to decide how

---

[12] The victim had seen her assailant for at least five minutes, in good light, close-up, and in a situation likely to fix his image in her mind. Her initial description reflected in the incident report was not so inaccurate as to raise significant doubts. She did not select any photo from the first spread shown to her at the hospital and rejected the picture of the other Stephen Jones. This indicates that she had a sufficiently good recollection of her assailant's features to distinguish him from others and that she was not predisposed to produce a suspect for the police. She noticed at least three distinguishing features — he was light skinned and had a big nose and big lips. Her recollection of his appearances at the voir dire exhibited good recall. Finally, her identification of his picture on the hackney license in the second display was positive, and made at a time when the memory of her assailant still should have been relatively fresh.

much weight to attach to [this] identification[ ], as well as to the [out-of-court identification] when they were admitted at trial." *Commonwealth* v. *Cincotta,* 379 Mass. 391, 397 (1979). See also *Commonwealth* v. *Botelho,* 369 Mass. at 866; *Commonwealth* v. *Funderberg,* 374 Mass. 577, 582 (1978); *Commonwealth* v. *Jones,* 375 Mass. 349, 355 (1978); *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 308 (1979).

Finally, we have been mindful throughout of the judge's finding that the victim did not project herself before him as a person of strong independent mind.  In a close or doubtful case, where impermissibly suggestive practices are present and the burdens of proof are implicated, such an observation might carry the day.  But that observation's linkage with the erroneous conclusions on the suggestiveness question and its over-all disharmony with the bulk of the evidence require that it be rejected as a decisive force in the analysis.

The order suppressing the identifications is reversed.

*So ordered.*