COMMONWEALTH vs. DARRYL HICKS.

Suffolk.   November 18, 1983. — March 6, 1984.

Present: ARMSTRONG, CUTTER & SMITH, JJ.

*Identification.   Due Process of Law,* Identification.

On review of the totality of the circumstances disclosed by the record of
a hearing on the defendant's motion to suppress a robbery victim's out-
of-court and in-court identifications of the defendant as one of the two
men who had robbed him, this court concluded that the identifications
were reliable, even though the police officer who drove the victim
back to the scene of the crime to make an identification told him that
fellow officers had apprehended the robbers and recovered his radio.
[578-584]

INDICTMENT found and returned in the Superior Court
Department on January 6, 1982.

A motion to suppress evidence was heard by *Linscott,* J.

*Michael J. Traft,* Assistant District Attorney (*Robin A.
Pearl,* Legal Assistant to the District Attorney, & *Francis X.
Collins,* Assistant District Attorney, with him) for the Com-
monwealth.

*Barry P. Wilson* for the defendant.

ARMSTRONG, J.   The Commonwealth appeals from a pre-
trial ruling allowing the defendant's motion to suppress a
robbery victim's out-of-court and in-court identifications of
the defendant as one of the two men who perpetrated the
robbery.   The circumstances were these.   At 8:00 P.M. on
October 7, 1981, the victim, an employee of Boston City
Hospital, got out of work and, because he lacked train fare,
proceeded to walk towards his home in the South End some
distance away.   On West Concord Street he was approached
by a young man on his left and asked the time.   He was then
approached by another young man on his right who bran-

dished a knife and asked for money. The victim turned over his small change and also his knapsack, which contained gym clothes, a can of Right Guard deodorant, shaving equipment, and a twelve-inch-long Panasonic AM-FM digital clock radio. The robbery lasted half a minute. The victim went immediately to a nearby fire station and called the police, who arrived on the scene within five minutes. The victim described the incident and the two robbers. The police drove him around the nearby streets for a while, but the robbers were not seen. The police dropped him off at his home.

Shortly thereafter the police detained two men seen walking together who approximated the victim's descriptions in color, age, weight and height, as well as in the colors of their coats. One of the two, the defendant, was seen to be carrying a radio consistent with the one which had been in the victim's knapsack. The police brought the defendant back to West Concord Street for identification. The victim identified the defendant and the other man as the robbers. Thereafter he identified a can of Right Guard deodorant taken from the defendant's pocket as identical in size to the one which had been in his knapsack and the radio seized from the defendant as the one that had been stolen from him in the robbery. (It was readily distinguishable from others of the same make and model because it was missing one knob and a piece of decorative metal trim.) This show-up took place roughly one hour after the robbery.

The basis of the suppression motion was a claim that the officer who drove the victim back to West Concord Street to make the identification told him that fellow police officers had apprehended the robbers and recovered the radio. The judge so found on conflicting testimony, and we must and do accept the finding that the statement was made. See *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980); *Commonwealth* v. *Day*, 387 Mass. 915, 919 (1983).[1] The analy-

---

[1] Contrast *Commonwealth* v. *Coy*, 10 Mass. App. Ct. 367, 373 (1980), where "the police scrupulously avoided mentioning to the victim . . . that paper money in the exact amounts stolen had been discovered in the defendant's pocket."

sis applied by the judge thereafter is not clear from the record. His remarks to counsel before their final arguments on the motion indicated that he would apply to the showup-identification, which he ruled was suggestive, a per se exclusionary rule, and that their arguments should be addressed to the question whether an identification at trial would have a source independent of the initial tainted identification. In his later written memorandum he found that "[t]he men picked up by the police do not resemble the men [the victim] described initially" and concluded that even the initial identification was not solidly enough based to overcome the improper suggestion. We conclude that on either analysis the judge erred and that the motion to suppress should have been denied.

The decision of the Supreme Judicial Court in *Commonwealth* v. *Botelho,* 369 Mass. 860 (1976), decided after *Neil* v. *Biggers,* 409 U.S. 188 (1972), but before *Manson* v. *Brathwaite,* 432 U.S. 98 (1977), outlined an interpretation then prevalent among some Federal courts concerning the due process requirements applicable to identification evidence. Under that view an impermissibly suggestive pretrial identification was to be excluded from evidence per se, and a subsequent identification could be made at trial only on clear and convincing evidence that the in-court identification had a source independent of the impermissibly suggestive pretrial identification. 369 Mass. at 866. It became clear only after the *Botelho* case, when the United States Supreme Court decided *Manson* v. *Brathwaite, supra,* that the due process clause of the Fourteenth Amendment does not require the per se exclusion of unnecessarily suggestive identifications where the suggestiveness has not caused the identification to be unreliable.

The *Botelho* case itself recognized that the per se exclusionary rule then applied by many of the Federal courts would not survive as a due process requirement if the United States Supreme Court were to hold that *Neil* v. *Biggers, supra,* applied to identifications made after the decision in *Stovall* v. *Denno,* 388 U.S. 293 (1967). *Botelho,*

at 872. The *Manson* case, of course, did so hold. See the discussion in *Commonwealth* v. *Venios*, 378 Mass. 24, 27 (1979); *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. 230, 235-236 (1978).

Under the *Biggers* and *Manson* cases, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson* v. *Brathwaite*, 432 U.S. at 114, quoted in *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. at 236. The focus of the reliability analysis is normally on the initial identification, not the later repetitions. *Commonwealth* v. *Wheeler*, 3 Mass. App. Ct. 387, 392 (1975). If the initial identification is found to have the requisite indicia of reliability, "then subsequent identifications would also appear reliable." *Commonwealth* v. *Botelho*, 369 Mass. at 872.

Trial judges do not have discretion to apply or not apply the holdings of *Manson* v. *Brathwaite* and *Neil* v. *Biggers*. The precedents of the Supreme Court defining the requirements of the Federal due process clause necessarily bind all State courts. *Matter of Roche*, 381 Mass. 624, 631 n.8 (1980). *Commonwealth* v. *Bryant*, 390 Mass. 729, 741 (1984). The Supreme Judicial Court has not adopted any more restrictive local rule (see, most recently, *Commonwealth* v. *Paszko*, 391 Mass. 164, 172 n.9 [1984]), and has on several occasions taken note of, and acquiesced in, this court's application of the reliability analysis of the *Biggers* and *Manson* cases. See, e.g., *Commonwealth* v. *Venios*, 378 Mass. at 27-28; *Commonwealth* v. *Cincotta*, 379 Mass. 391, 396-397 (1979); *Commonwealth* v. *Moon*, 380 Mass. at 759.[2] See also Liacos, Massachusetts Evidence 255 (5th ed. 1981). At the present time the Commonwealth is entitled to

---

[2] This court has applied *Biggers-Manson* reliability analysis in such cases as *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. 230 (1978); *Commonwealth* v. *Bernard*, 6 Mass. App. Ct. 499 (1978); *Commonwealth* v. *Cincotta*, 6 Mass. App. Ct. 812 (1979); *Commonwealth* v. *Sampson*, 7 Mass. App. Ct. 514, 519 (1979); *Commonwealth* v. *Avery*, 12 Mass. App. Ct. 97, 102-103 (1981). Contrast *Commonwealth* v. *Boiselle*, 16 Mass. App. Ct. 393, 397 (1983).

put in evidence otherwise admissible identifications that, despite improper suggestiveness, satisfy the reliability test.

The judge did not make findings bearing on each of the reliability factors listed in the *Biggers* and *Manson* cases.[3] It has been strongly recommended that judges make such findings. *Commonwealth* v. *Venios,* 378 Mass. at 28. *Commonwealth* v. *Storey,* 378 Mass. 312, 319 n.9 (1979). *Commonwealth* v. *Moon,* 380 Mass. 751 (1980). *Commonwealth* v. *Marks,* 12 Mass. App. Ct. 511, 516 (1981). *Commonwealth* v. *Paszko,* 391 Mass. at 172, n.9. Analysis in terms of the *Biggers-Manson* reliability factors would have directed the judge's attention to certain aspects indicative of reliability despite the unfortunate remarks by the officer who drove the victim to the showup.

The confrontation took place only an hour (or slightly over) after the robbery, well before the underlying dangers of fading memory or image-transferrence could have arisen. See *Simmons* v. *United States,* 390 U.S. 377, 383-384 (1968); *Commonwealth* v. *LaPierre,* 10 Mass. App. Ct. 641, 642-644 (1980). The identification was made without hesitation, the victim indicating that he was "positive" on the point. Compare the identification (by Mark) in *Commonwealth* v. *Correia,* 381 Mass. 65, 71 (1980). There was no prior mistaken identification nor prior failure to identify the defendant. See *Commonwealth* v. *Botelho,* 369 Mass. at 869.[4] The thirty-second duration of the robbery, involv-

---

[3] "The factors to be considered are . . . [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson* v. *Brathwaite,* at 114, quoted in *Commonwealth* v. *Gordon,* 6 Mass. App. Ct. at 236.

[4] In the *Botelho* case the identifying witness had previously been asked to identify the defendant and had stated, "That's positively not him." 369 Mass. at 863. In *Commonwealth* v. *Correia, supra,* where the identifying witnesses had failed to identify the defendant from photographs, the court emphasized that the identifications were definite the first time the witnesses saw the defendant in person. 381 Mass. at 80-81.

ing unobstructed face-to-face confrontation under trying circumstances, was "sufficient to fix the robber[s'] face[s] in the mind of the witness." *Commonwealth* v. *Redding,* 382 Mass. 154, 158 (1980). See *Commonwealth* v. *Sampson,* 7 Mass. App. Ct. 514, 519 (1979) (five to ten seconds gave adequate opportunity to view the criminal). Compare *Commonwealth* v. *Roberts,* 362 Mass. 357, 366-367 (1972) (fact that witness viewed assailant for only two or three seconds "[went] to the weight and not to the admissibility of [the] testimony"). It was dark, but the street was lighted, and the victim, who had been walking the streets for a considerable distance and whose eyes were thus presumably accustomed to the lighting condition, made no complaint of difficulty in seeing and could distinguish colors (the coats) and details (the knife).

The contention that the identification was not reliable has focused on the accuracy of the victim's descriptions of the robbers given to police officers five minutes after the crime. The testimony was uncontradicted that *at that time* the victim described the robber who stood on his right as a black male; six feet, two inches; one hundred eighty pounds; twenty-one years of age; and wearing dark pants and a dark jacket, either blue or black in color. He was described as being taller than the robber on the left, who was said to stand six feet and to be wearing a tan coat. The testimony was also uncontradicted that the defendant is a black male; is six feet, five inches; weighed (at time of hearing) one hundred ninety pounds; was (at time of robbery) either twenty or twenty-one years of age; and was wearing, when arrested, jeans and a dark jacket, either blue or black in color. He was taller than his companion, identified as the other robber, by three to five inches.[5] The companion was wearing a tan jacket.[6]

---

[5] The companion did not appear at the suppression hearing. (He may have been separately tried as a juvenile, or may have pleaded guilty, there being a suggestion in the record that he admitted his guilt.) His height was variously estimated at six feet even, six feet, one inch, and six feet, two inches.

[6] The companion, who had been described by the victim as also wearing "dark pants", apparently wore sweat pants at the time of arrest. The

The suppression hearing took place nearly two years after the robbery. The victim repeatedly stated that he had little present memory of the details of that evening. Nevertheless, he allowed himself to be drawn by skillful cross-examination into stating details which were at variance with the statement he had made to police five minutes after the robbery. In particular, his testimony at the suppression hearing put the shorter robber wearing the tan jacket on his right, and he identified the defendant as that man. He was impeached on details such as the length of the knife; whether one or both robbers carried knives; whether they wore dress pants or casual pants (see note 6, *supra*).

The aspect of the identification that disturbed the judge was not the slight discrepancies in absolute heights (one to three inches — compare, e.g., *Commonwealth* v. *Mobley*, 369 Mass. 892, 896 n.1 [1976] [discrepancy of four inches]; *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. at 238 [discrepancy of "possibly as much as nine inches," the robber having been seated]) but rather the thought that the victim could describe the defendant as the shorter of two robbers standing close together when in fact he was taller than the other alleged robber by three to five inches. It is clear from the record, however, that such confusion did not exist the evening of the robbery but was of later vintage. There was no evidence to support the judge's finding that the victim described the robber on the left as six feet, two inches, and the robber on the right as six feet even.[7] The evidence of the converse was uncontradicted. This erroneous finding was

record does not indicate the color of the pants. According to the defendant, he and the companion had been in the companion's apartment immediately before their arrest; a change in the companion's clothing, while speculative, is not out of the question. At the hearing on the motion to suppress, the victim acknowledged that at a later time he had testified that both robbers wore "dress pants." How much later does not appear. There is no evidence (or contention) that the victim described the pants to the police the night of the robbery as dress pants.

[7] The finding would be accurate if it were intended as a statement of the victim's testimony at the suppression hearing, but it is clearly erroneous as a statement of the victim's description to the police on the night of the crime.

central to the judge's conclusion that "[t]he men picked up by the police do not resemble the men [the victim] described initially." Without it the conclusion cannot stand.[8]

A point not considered by the judge, over which the parties have differed in argument before us, is the significance, if any, to be accorded the defendant's possession of the victim's radio (and, inferentially, his can of deodorant) in determining the reliability of the initial identification under the *Biggers* and *Manson* cases. It has been stated that "reliability" analysis should not be extended beyond factors that have relevance to identification so as to take account of other types of evidence of the defendant's guilt. See *Manson* v. *Brathwaite*, 432 U.S. at 118 (footnote) (Stevens, J., concurring); Sobel, Eyewitness Identification § 6.2 (1983). Such a principle, however, should not be applied to fruits of a robbery found on the person of a defendant in the immediate aftermath of the crime.

---

[8] The judge made several other findings bearing on the accuracy of the initial description, all of which are consistent with his ultimate conclusion while having insufficient probative force to support the conclusion. They are: First, the defendant when he was apprehended wore a pink sweater under his dark blue or black jacket. (That fact was undenied, as was the victim's testimony that he could not see the sweater because the jacket was zipped up at the time of the robbery.) Second, the defendant when apprehended was wearing Calvin Klein jeans. (The victim's description to the police just after the robbery was that the robbers both wore "dark pants".) Third, the defendant was in his early twenties and the other person apprehended was a juvenile. (The victim had described both robbers as twenty-one years of age.) That estimate was high only in the case of the juvenile. The evidence did not indicate the juvenile's age, and the judge did not see him. We know that he was of a mature height. See note 5, *supra.* Fourth, the defendant weighed about 190 lbs. and had a mustache. (The victim estimated 180 lbs. and did not mention a mustache. There was no evidence bearing on whether the defendant's mustache at the time of the robbery was so significant a facial feature that an omission to mention it would give rise to doubt. Compare *Commonwealth* v. *Cinelli*, 389 Mass. 197, 204 [1983].) We accept each of the subsidiary findings in accordance with established principles (see *Commonwealth* v. *Day*, 387 Mass. 915, 919 [1983]), but for the reasons stated parenthetically feel that in the aggregate they cannot support a conclusion that "the men picked up by the police do not resemble the men [the victim] described initially."

It was part of the victim's description that the defendant left the scene of the crime carrying the victim's radio and deodorant. That fact has the same logical relationship to the reliability of the identification as the victim's description that the defendant left the scene carrying a knife or wearing a black or blue jacket — factors which are taken into consideration as of course in evaluating the accuracy of a witness's prior description. See, e.g., *Commonwealth* v. *Alves*, 6 Mass. App. Ct. 572, 582 (1978). In a recent case, *Commonwealth* v. *O'Loughlin, post* 972 (1984), the defendant was found in possession of a reddish-handled knife that the rape victim had described to the police. That factor would have carried very substantial weight if the case had required analysis of reliability; and it should logically have had no less weight if the knife had been taken from the victim in the course of the rape. The weight, if anything, should have been greater because of the lesser likelihood that the knife was merely similar to the one carried by the rapist. Consider also the facts in *Commonwealth* v. *Benbow*, 16 Mass. App. Ct. 970 (1983).

Out-of-State authority is to the same effect. See *United States* v. *Reid*, 517 F.2d 953, 967 (2d Cir. 1975) (defendant's possession of victim's stolen revolver when apprehended "may be considered on the issue whether there was a substantial likelihood of misidentification"); *McNary* v. *Sowders*, 660 F.2d 703, 708-709 (6th Cir. 1981) (recovery of pistol taken from victim is a "powerful corroborative circumstance" supporting reliability); *Lindsey* v. *State*, 264 Ark. 430, 432 (1978) (defendant's possession of bills in denominations of those stolen contributes to showing of reliability). See also *United States ex rel. Gonzalez* v. *Zelker*, 477 F.2d 797, 803-804 (2d Cir.), cert. denied, 414 U.S. 924 (1973); *Willis* v. *Garrison*, 624 F.2d 491, 494 (4th Cir. 1980); *Cates* v. *United States*, 379 A.2d 968, 970 n.2 (D.C. 1977). The radio and the can of deodorant could properly be regarded as making the notion that the defendant was misidentified "unlikely in the last degree." *United States ex rel. Springle* v. *Follette*, 435 F.2d 1380, 1385 (2d Cir. 1970) (Friendly, J., concurring).

No purpose would be served by a time-consuming remand of this case for further findings. It is not unusual for an appellate court, in reviewing rulings on pretrial motions where findings have not been made or have been made but are clearly erroneous, to review the ruling in question based on an independent assessment of the evidence. See *Commonwealth* v. *Correia*, 381 Mass. 65, 76 (1980); *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. at 235-236; *Commonwealth* v. *Mattias*, 8 Mass. App. Ct. 786, 788 (1979); *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 83, 89-93 (1980); *Commonwealth* v. *Worlds*, 9 Mass. App. Ct. 162, 171 (1980). See also *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 135-136 (1983). Nothing of significance to the reliability test turns here on conflicting testimony.

The officer's statements, of course, should have avoided any aspects of suggestiveness. For constitutional purposes, however, the significant question is whether the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *Simmons* v. *United States*, 390 U.S. 377, 384 (1968). *Neil* v. *Biggers*, 409 U.S. at 197. Some suggestion is inherent in all showups. The witness knows he would not be asked to make an identification unless the police had reason to suspect the detainee's involvement. The degree to which suggestiveness may have tainted the reliability of the identification must be measured in " 'the totality of the circumstances.' " *Commonwealth* v. *Paszko*, 391 Mass. at 170. Here the victim must have taken the officer's statement to mean that other police officers *thought* they had apprehended the robbers and *thought* that the radio recovered might be the victim's. The victim's name or social security number did not appear on the radio; only the victim could say with certainty that the radio was his. He was not shown the radio until after he had identified the robbers. Any suggestiveness was in that respect and in degree less than the suggestiveness present in *Commonwealth* v. *Denault*, 362 Mass. 564, 566 (1972), where the witness identified the defendant after viewing the black sedan with the identical

registration number that she had reported to the police, or in *Harris* v. *Wyrick*, 644 F.2d 710, 712 (8th Cir. 1981), where the victim viewed the goods taken from her in the robbery spread out in front of the defendant before she identified him. In view of the strong showing of reliability, we think that a jury should be permitted to assess the accuracy of the victim's identification of the defendant.[9]  See *Commonwealth* v. *Barnett*, 371 Mass. 87, 94 (1976).

The order allowing the motion to suppress the in-court and out-of-court identifications is reversed, and a new order is to be entered denying the motion. The case is remanded for trial.

*So ordered.*

---

[9] We have omitted discussion of burden of proof because, in the view of the panel, the case does not turn on it. It has been said that, under the *Biggers-Manson* approach, the burden remains on the defendant to prove that the suggestiveness was so significant in the totality of the circumstances as to raise a substantial likelihood of misidentification. See, e.g., *Commonwealth* v. *Botelho*, 369 Mass. at 871-872; *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. at 235-236. Other cases suggest that, on a showing by the defendant of unnecessary suggestiveness, the burden should shift to the Commonwealth to prove that the identification was nonetheless reliable. See *Commonwealth* v. *Venios*, 378 Mass. at 28, citing *State* v. *Cefalo*, 396 A.2d 233, 236-240 (Me. 1979); Smith, Criminal Practice and Procedure § 420 (2d ed. 1983). Compare *Commonwealth* v. *Powell*, 10 Mass. App. Ct. 57, 61 (1980). If the burden does shift to the Commonwealth, the Commonwealth clearly sustained the burden in this case.