COMMONWEALTH *vs.* DAVID R. JONES.

No. 86-427.

Plymouth. January 14, 1987. — November 17, 1987.

Present: PERRETTA, QUIRICO, & KASS, JJ.

*Identification. Due Process of Law*, Identification. *Evidence*, Identification
   of inanimate object.

Discussion of the doctrine of *Manson* v. *Brathwaite*, 432 U.S. 98, 114
   (1977), with reference to due process considerations governing the ad-
   missibility of identification testimony at a criminal trial. [59-60]
A judge's clear and thorough subsidiary findings provided adequate support
   for his rulings on pretrial motions to suppress evidence of identifications
   of a criminal defendant based on "one-on-one" confrontations arranged
   while the defendant was in police custody. [60-62]
No due process considerations limited the admissibility of testimony con-
   cerning identifications of a criminal defendant's automobile. [62]

INDICTMENTS found and returned in the Superior Court De-
partment on December 5, 1983.

Pretrial motions to suppress evidence were heard by *William
H. Carey*, J.

Applications for interlocutory appeals were allowed by *Paul
J. Liacos*, J., in the Supreme Judicial Court for the county of
Suffolk and the appeals were reported by him to the Appeals
Court.

*William P. Homans, Jr.*, for the defendant.

*Samuel Lazarus*, Assistant District Attorney, for the Com-
monwealth.

QUIRICO, J. The defendant has been indicted for the follow-
ing offenses allegedly committed in Hull on or about July 8,
1983: (1) breaking and entering in the night-time the dwelling
house of Bertram and Marjorie Paley, with intent to commit
a felony; (2) breaking and entering in the night-time the dwell-
ing house of Eugene and Theresa Roberts, with intent therein

to commit a felony; and (3) stealing money with a value of more than one hundred dollars, the property of Theresa Roberts.

We have before us consolidated interlocutory appeals which were allowed by a single justice of the Supreme Judicial Court pursuant to Mass.R.Crim.P. 15(b), as appearing in 397 Mass. 1225 (1986), and reported by him to a panel of this court. The defendant contests the denial, by a judge of the Superior Court, of two motions to suppress identification testimony, while the Commonwealth contests the judge's allowance of a third motion to suppress identification testimony.

After holding an evidentiary hearing on the motions to suppress, the judge filed two written decisions, each of which contained clear and thorough findings of subsidiary facts which are supported by the evidence, general findings based on the subsidiary findings, correct rulings on the applicable law, and then an order disposing of the particular motion or motions involved. We affirm his rulings.

The ultimate legal conclusion to be drawn from the subsidiary facts found by the judge who presided at the evidentiary hearing on the motions is a matter for our review. *Commonwealth* v. *Murphy*, 362 Mass. 542, 547 (1972), and at 550-551 (Hennessey, J., concurring). *Commonwealth* v. *Accaputo*, 380 Mass. 435, 448 n.18 (1980). *Commonwealth* v. *Cadoret*, 388 Mass. 148, 150 (1983). In *Commonwealth* v. *Frank*, 357 Mass. 250, 254 (1970), the court said: "[C]areful findings supported by the evidence and upholding an in-court identification are not likely to be disturbed by us. . . . Effective and constitutionally adequate administration of criminal justice does not require us in the face of such findings to second guess the trial judge who is certainly in a far better position than we to determine the facts upon which a ruling on the admissibility of an in-court identification is based."

The findings of the judge who presided over the hearing on the motions to suppress evidence were substantially as follows:

(1) *The Paley Identification of the Defendant and His Automobile.*

On the night of July 7-8, 1983, Bertram and Marjorie Paley were in the second floor bedroom of their summer home in

Hull. The lights were on in the upstairs hallway and at the bottom of the stairs, and some light from the street lights entered their bedroom. The Paleys' daughter-in-law, who was visiting them, was in her own room on the second floor. The Paleys' son was expected to arrive some time between midnight and 2:00 A.M.

At approximately 1:15 A.M., on July 8, Mrs. Paley was awakened by the sound of her bedroom door opening. Upon awaking she saw a man, approximately the size of her son, standing in the doorway for about three seconds. Thinking the man was her son, she wished him goodnight and he left the room.

Soon thereafter, Mrs. Paley heard her daughter-in-law shriek; she shook her husband awake and rushed to her daughter-in-law's bedroom. A figure brushed past her, and she caught a fleeting side view of a man as he headed down the stairs. Mrs. Paley was unable to stop the intruder, but she saw him run to a vehicle, described as a small blue sports car, and drive off. Mrs. Paley further testified that the intruder was bald and wearing a T-shirt and chino pants.

The police arrived at the Paleys' house, and there was a conversation between them and the Paleys. Thereafter, a police radio dispatch was issued describing the intruder as wearing a white shirt and chino pants and driving a small blue convertible automobile. About five minutes later the police broadcast the information that the man was bald.

At about 3:30 A.M. on the same day, another police officer, aware of the radio broadcast description, stopped a blue Fiat sports car driven by the defendant, who was wearing a visor, a white polo shirt adorned with an alligator symbol, with a dark green jacket or shirt over the white shirt, and khaki slacks. The defendant was detained by the police. A police dispatcher called the Paleys and asked them to drive to the point where the defendant was being detained. The dispatcher also told the Paleys that the man there "was a perfect match" of their descriptions. At the scene, Mr. Paley said he was "fairly sure" that the defendant's vehicle was the one in which he had seen the intruder escape. Although the lighting at the place where the

defendant was detained was "dim", Mrs. Paley made a "cautious" identification of the man from a distance of less than twenty feet. A police officer replied, "[Y]ou've got to make a positive identification or I can't go forward with the case," or words to that effect. Mrs. Paley then made such an identification.

(2) *The Saltalamacchia Identification of the Defendant and His Automobile.*

During the same early morning of July 8, 1983, Jeanne Saltalamacchia was at home with her mother and stepfather, Theresa Roberts and Eugene Roberts, in Hull. At about 1:45 A.M. Jeanne's boy friend left the house and she went upstairs to see if she could see him leaving on his bicycle. She did not see him, but she did see a blue sports car with a black roof and luggage rack, about 135 feet diagonally away from the house, on a well-lighted street. The car was of a type never seen by her before in the ten years she had lived in that neighborhood.

Jeanne then left the window to change for bed, but went back to look out the window and saw a man wearing a white polo shirt and tan trousers in the front yard of her house. She could not tell whether he was bald or had facial hair, but she thought he had fair-colored hair. As the man walked away, Jeanne lost sight of him and she then went to bed. In the next few minutes or half hour, Jeanne heard some noise downstairs and then later on she heard a car speed off up the street.

In the morning, Mrs. Roberts asked Jeanne if she or her brother had used the kitchen window, which was open, to enter the house. Jeanne had not done so, and her brother was not home. About $165 was missing from Mrs. Roberts' pocketbook, which had remained in the kitchen overnight. Jeanne then told her mother about what she had observed and heard earlier that morning, and they called the police.

The police asked Mrs. Roberts and Jeanne to drive to the tow lot to which the defendant's car had been taken earlier that morning after the defendant had been identified by Mrs. Paley and then arrested by the police. Upon arriving at the tow lot, Jeanne immediately recognized the defendant's car.

She then went to the police station where she observed the defendant facing in different directions, through a window in a door at the end of a corridor. There was no lineup of the defendant with any other persons, and there was conflicting evidence as to whether the defendant was handcuffed when seen by Jeanne at the station.

The identification of the defendant by Jeanne at the police station was conceded by the Commonwealth to have been impermissibly suggestive. Despite the Commonwealth's argument that Jeanne's subsequent identification at the probable cause hearing and before the motion judge be allowed in evidence as arising from an independent source, the judge ruled that all of Jeanne's identifications of the defendant were inadmissible. However, he denied the motion to suppress her identification of the defendant's car.

*Discussion.*

The legal issues involved in this case are not novel. They have been the subject of discussion in numerous judicial decisions by both Federal and State courts for many years, and particularly since June 12, 1967, when the United States Supreme Court handed down the decisions in *United States* v. *Wade,* 388 U.S. 218 (1967), *Gilbert* v. *California,* 388 U.S. 263 (1967), and *Stovall* v. *Denno,* 388 U.S. 293 (1967), and since the later decisions of *Neil* v. *Biggers,* 409 U.S. 188 (1972), and *Manson* v. *Brathwaite,* 432 U.S. 98 (1977). The rules applied in those cases have been applied in many decisions by both the Supreme Judicial Court and the Appeals Court of this Commonwealth. It would serve no useful purpose to attempt to cite or discuss any large number of these Massachusetts decisions, but it may be helpful to consider just a few of them.

In *Commonwealth* v. *Key,* 19 Mass. App. Ct. 234 (1985), this court said, at 239: "In *Stovall* v. *Denno,* 388 U.S. 293 (1967), the Supreme Court established a due process right to exclude identifications resulting from procedures that were 'unnecessarily suggestive and conducive to irreparable mistaken identification.' *Id.* at 302. The due process clause, however, does not require the per se exclusion of identification testimony where the suggestiveness of the procedure has not rendered

the identification unreliable. *Manson* v. *Brathwaite*, 432 U.S. 98, 114 (1977). Contrast *Commonwealth* v. *Donovan*, 392 Mass. 647 [,cert. denied, 469 U.S. 1038] (1984) (per se exclusionary rule where Sixth Amendment right to counsel violated). The *Brathwaite* Court emphasized that 'reliability is the linchpin in determining the admissibility of identification testimony.' 432 U.S. at 114. The reliability of the identification is to be judged according to the following factors: '[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description . . ., [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Id. Neil* v. *Biggers*, 409 U.S. 188, 199-200 (1972). For a thorough discussion and analysis of the relevant principles and cases, see *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. 574, 576-578 (1984)."

We note that, while this court has accepted and applied the doctrine of the *Manson* v. *Brathwaite* case on a number of occasions, the Supreme Judicial Court has not done so. In *Commonwealth* v. *Cincotta*, 379 Mass. 391 (1979), that court said, at 396-397, "The Appeals Court had some warrant in this court's opinions for assuming that we were favorably disposed toward the *Manson* doctrine and prepared to accept and apply it — the question left open in *Commonwealth* v. *Botelho*, 369 Mass. 860, 874-875 (1976). In fact we considered the question still open, as we indicated clearly in *Commonwealth* v. *Venios*, 378 Mass. 24, 27-28 (1979), decided some four months after the Appeals Court's decision of the present case." The question was also left open in *Commonwealth* v. *Dougan*, 377 Mass. 303, 317 (1979), in *Commonwealth* v. *Moon*, 380 Mass. 751, 759 (1980), in *Commonwealth* v. *Howell*, 394 Mass. 654, 660 (1985), and in *Commonwealth* v. *Melvin*, 399 Mass. 201, 205 n.6 (1987). This situation presents no difficulty in the present case, where the record shows clear and thorough subsidiary findings by the motion judge. These findings provide adequate support to the judge's conclusions as to both the Paley and the Saltalamacchia identifications.

In this case there were several instances of one-on-one identifications of the defendant. While often described as disfavored, such identifications are not impermissibly suggestive per se. A defendant who is questioning the admissibility of such an identification has the burden of proving by a preponderance of the evidence that impermissibly suggestive procedures were used at the particular confrontation. *Commonwealth* v. *Simmonds*, 386 Mass. 234, 239 (1982). *Commonwealth* v. *Howell*, 394 Mass. at 661 (1985).

In *Commonwealth* v. *Barnett*, 371 Mass. 87 (1976), cert. denied, 429 U.S. 1049 (1977), the court said, at 91-92: "A 'one-on-one' confrontation with a person in custody is disfavored generally as a basis of identification . . . but such showups of suspects to eyewitnesses of crimes have been regularly held permissible when conducted by the police promptly after the criminal event. Of course, where the circumstances are so exigent as to exclude waiting to arrange a lineup, the case is very clear: in *Stovall* an 'immediate hospital confrontation was imperative' (388 U.S. at 302) because the eyewitness was believed to be near death. Exigent or special circumstances, however, are not prerequisite. . . . Such meetings between witnesses or victims and suspects in custody are often unavoidable or nearly so; and in any event the police procedure of arranging these showups is recognized as usual and natural and justified by the need for efficient investigation in the immediate aftermath of crime. . . . To have the witness view the suspect while his recollection or mental image of the offender is still fresh, before other images crowd in or his attempts to verbalize his impressions can themselves distort the original picture, provides the witness with good opportunity for an accurate identification. . . . A further consideration is that prompt confrontation yielding a negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may be in error and releases them quickly to follow another track. . . . The general view that such speedy confrontations are permissible is accepted in this jurisdiction and elsewhere" (citations omitted). *Commonwealth* v. *Bumpus*, 354 Mass. 494, 498-502 (1968), cert. denied, 393 U.S. 1034

(1969). *Commonwealth* v. *Harris*, 395 Mass. 296, 298-300 (1985). *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. 574, 583 (1984). *Commonwealth* v. *Perretti*, 20 Mass. App. Ct. 36, 41-42 (1985). *Commonwealth* v. *Brimley*, 20 Mass. App. Ct. 967, 968 (1985).

"Of course, if there are special elements of unfairness, indicating a desire on the part of the police to 'stack the deck' against the defendant, an identification resulting from such a confrontation would be inadmissible. *Commonwealth* v. *Moon*, 380 Mass. 751, 756-759 (1980)." *Commonwealth* v. *Leaster*, 395 Mass. 96, 103 (1985).

While it is possible that, in an extreme case, due process considerations might limit the admissibility of testimony of an identification of an inanimate object, the identification of the defendant's automobile does not present such a case, and we need not discuss the subject further. *Commonwealth* v. *Simmons*, 383 Mass. 46, 48, 49-53 (1981).

*Conclusion.*

In his two decisions the judge (a) denied the motion to suppress evidence of the identification of the defendant by Bertram Paley and his wife, Marjorie Paley; (b) allowed the motion to suppress evidence of the identification of the defendant by Jeanne Saltalamacchia; and (c) denied the motion to suppress evidence of the identification of the defendant's automobile. These rulings are affirmed.

*So ordered.*