COMMONWEALTH *vs.* STEVEN T. ROGERS
(and nine companion cases[1]).

No. 92-P-1445.

Suffolk. September 12, 1994. - April 13, 1995.

Present: PERRETTA, DREBEN, & GILLERMAN, JJ.

*Search and Seizure*, Threshold police inquiry, Probable cause. *Constitutional Law*, Search and seizure, Admissions and confessions. *Arrest. Identification. Evidence*, Admissions and confessions. *Practice, Criminal*, Voluntariness of statement, Trial of defendants together, Severance.

A police officer had probable cause to arrest three defendants and searches of the three, incident to their arrest, were lawful; the judge at an ensuing trial properly denied motions to suppress evidence seized as a result of the searches. [399-402]

The judge at a criminal trial correctly denied defendants' motion to suppress an out-of-court identification by the victim of a rape, where the one-on-one confrontation was conducted promptly after the incident and without suggestive statements by police, and where there were numerous factors, including the victim's opportunity to observe her assailants, that supported the reliability of her identifications. [402-405]

At a criminal trial, the judge correctly denied the defendant's motion to suppress a statement made to police officers, where the statement was voluntary and made after Miranda warnings were given; where it was not the product of an earlier coerced statement; and where it was not the result of the "functional equivalent" of express questioning. [405-407]

At the trial of three defendants, in which there was no *Bruton* issue, no necessity for severance of the defendants' cases was demonstrated where the Commonwealth's theory and evidence presented did not create a danger that the jury would feel compelled to choose among the defendants rather than to assess the proof against each separately. [407-408]

At a criminal trial, no substantial risk of a miscarriage of justice arose from a judge's denial of a defendant's motion to sever his case from codefendants' cases, which precluded the defendant from introducing a statement he had made to police that was inculpatory of all the defendants, where the statement was inconsistent with the defendant's trial strategy and would not have helped his defense under any circumstances. [409-410]

---

[1]Four are against Steven T. Rogers; five are against Magno A. Aguilar.

INDICTMENTS found and returned in the Superior Court Department on September 10, 1987.

Pretrial motions to suppress evidence were heard by *Sandra L. Hamlin*, J., and the cases were tried before *Robert V. Mulkern*, J.

*Timothy M. Farris* for Steven T. Rogers

*Louis P. Font* for Magno A. Aguilar.

*Jill P. Furman*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On the night of August 19, 1987, three men broke into an apartment on Marlborough Street in Boston and raped a sixty-seven year old woman while her son-in-law was held in his bedroom, face down on a pillow, with a knife to his neck. The assailants demanded his jewelry and money, but he had neither. He did, however, offer his automatic teller machine (ATM) bank card and told the assailants his access code number. After the three men fled with various items, including the bank card, the son-in-law called the police. Descriptions of the men were soon dispatched by the police. A short time later, an officer saw three men at an ATM about eight blocks from the crime scene. The officer believed the men to be a close match to the descriptions he had heard on his radio. He arrested the men and brought them to Marlborough Street where they were shown to the victims[2] who were about to be brought to the hospital. After a trial on the numerous indictments that ensued,[3] the jury found the defendants Rogers and Aguilar guilty.[4] On appeal, both defendants argue that their motions to suppress (physical evidence, identifications, and statements) should have been allowed. The defendant Rogers also claims error in the denial

---

[2]In order to avoid confusion, we refer to the second victim as the son-in-law.

[3]Breaking and entering a dwelling house in the nighttime with the intent to commit a felony and therein arming himself with a dangerous weapon, aggravated rape, armed assault on a person sixty-five years or older with the intent to rob, assault and battery by means of a dangerous weapon on a person sixty-five years or older, and armed robbery.

[4]The third defendant, Andrew Clemenson, pleaded guilty in the course of the trial.

of his motion to sever his trial from that of the codefend-ants.[5] We affirm the convictions.

1. *The crimes.* There was evidence to show that the victim had gone to the home of her daughter and son-in-law be-cause the daughter was about to have a baby and was going to the hospital. The victim was to stay and care for her fif-teen month old granddaughter. After the birth of his second child, the son-in-law returned home and went to bed at about 11:30 P.M. The granddaughter was asleep in her room. The victim read until about 2:30 A.M., and then went to bed on a pull-out couch just outside her granddaughter's room.

Shortly after turning out her light, the victim heard a noise in the kitchen. She got out of bed to investigate and saw a man standing in the kitchen area of the apartment. The apartment was illuminated by the glow of city lights coming through skylights in the kitchen area and near the pull-out couch. The victim saw that the man was black, about six feet tall, and holding a knife. She also saw that he had very little hair; he was either bald, or he had shaved his head. She later identified this man as the defendant Rogers.

As Rogers lunged and snarled that he would kill her if she did not get down on the couch, the victim saw two other men. One was black and the other lighter-skinned. Based upon her observations throughout her ordeal, she described the darker and taller of these two men, the defendant Clemenson, as being youthful in appearance, wearing sneak-ers and walking with a bouncy step. She described the third man, the defendant Aguilar, as wearing a white tee shirt or jersey with letters and a cap or band on his head. He was about five feet six inches tall. The victim believed that, be-cause of this man's accent and mannerisms, he was Hispanic.[6]

---

[5]Although we have considered numerous other claims raised by the de-fendant Aguilar, those issues warrant no discussion beyond that set out in the Commonwealth's brief.

[6]At some point before this man raped the victim, he told her that he would not hurt her. That statement led the victim to believe the man was Spanish because: "I was hoping from his manner that he had sort of an inherent respect for age that I associate with the Spanish. And when he

Rogers again threatened to kill the victim if she did not keep her eyes closed. He demanded to know who was in the house and where any money was kept. He sent Clemenson and Aguilar down the hall and repeatedly threatened the victim. When the men returned, Rogers told Aguilar, who also had a knife, to watch the victim. The victim could hear noise, drawers being opened and closed, coming from the upstairs level of the apartment. When Rogers returned, he ordered Aguilar out of the room.

Notwithstanding Rogers's threats that he would stab the victim's eyes out if she made any noise, the victim struggled for his knife and begged him not to harm her granddaughter. Rogers scraped the tip of the knife blade across the victim's abdomen, held her arms behind her back, and raped her. While Rogers was atop her, the victim saw Aguilar watching. She pleaded for help, but Rogers ordered him away, completed the rape, taunted the victim, and left the area. After Rogers, it was Aguilar. The victim again pleaded with him for help. He looked down the hallway, approached the couch, and raped the victim.

While the victim was being terrorized and assaulted, the son-in-law was being held in his bedroom. He had been awakened when two men entered the room, put a knife to his throat, and threatened to kill him if he moved or made a sound. He described one of the men as tall, black, and bald and the other as being "considerably shorter" and sounding "Spanish." The men demanded money and jewelry, but the son-in-law told them he had neither. He directed them to his Bank of New England ATM card in his wallet and told them the access code number.

After the rapes, the victim was dragged into her son-in-law's room and ordered to lie down on the bed next to him. The victims remained where they were until the apartment became quiet, about four to five minutes; then the son-in-law called the police. When they arrived, the victim told them that three men had broken into the apartment and that she

---

had said that he would not hurt me — it was just the way he said it and I felt this."

had been raped by two of them. She described the three men as follows: a young, bald-headed, black man, about six feet tall, and wearing a jersey; a black man who "seemed young"; and a light-skinned Hispanic man who was the smallest of the three. As will be discussed below, when the defendants were brought to the scene after their arrest, the victim was in an ambulance with two attendants, her son-in-law, and her granddaughter who was crying hysterically. The victim was able to identify the men who raped her, Rogers and Aguilar, but not the third man, Clemenson.

2. *The motions to suppress.* After six days of evidentiary hearings, the motion judge denied all the motions to suppress without making written findings of fact. As for the consequence of this failure, see *Commonwealth* v. *Lanoue*, 392 Mass. 583, 586 n.2 (1984).

a. *The physical evidence.* Boston police officer Kevin Rodday testified that at 3:40 A.M., August 20, 1987, he was in his cruiser in front of the police station on Berkley Street when information concerning the rape came over his police radio. The dispatch included the location of the crime and the fact that a Bank of New England ATM card had been taken. Descriptions of the suspects were also given. According to Rodday, he was informed that the assailants were two black males, one being young, six feet tall, medium build, shaved head, and wearing a jersey shirt. The second black male was said to be younger than the first and wearing dark clothing. Rodday also heard over his radio that an Hispanic male, smaller than the other two men, was also involved.[7]

---

[7]In that portion of their briefs dedicated to the motions to suppress, the defendants argue that the radio dispatcher at the police turret relayed information concerning two black males only and made no reference to an Hispanic. That argument is based upon the contents of the turret tapes. Although it appears from the transcripts of the hearing on the motions that the tapes, or portions of them, were played at the hearing, there is no transcription of the contents. Even assuming that the turret tape recording of the radio dispatch was silent on the issue of whether an Hispanic male was involved in the crimes, Rodday testified at the hearing that he could hear on his radio information being relayed to the dispatcher at the turret by the officers who were at Marlborough Street. See *Commonwealth* v. *Lanoue*, 392 Mass. at 588 ("In the absence of subsidiary findings, we as-

With these facts in mind, Rodday drove to the Kenmore Square area to look for automatic teller machines. It was 3:55 A.M., when he arrived at the intersection of Massachusetts Avenue and Boylston Street, which he knew to be about eight blocks from the scene of the crime. He saw an ATM in a building with a large, well-lit, glass foyer. There were three men in the foyer: two black males, facing the machine, and a short Hispanic, looking at him through the glass door. Rodday turned his cruiser around and pulled along the curb in front of one of the glass doors. He could see that one of the black men was about six feet tall and was wearing a striped jersey and a hat or cap. The second black man, who was wearing dark clothing, appeared younger and thinner than the first.

Exiting the foyer, the three men walked down Massachusetts Avenue and Rodday slowly drove along directly behind them. After they had gone about 100 feet, Rodday saw one of the men throw a shiny object to the ground. After using his radio to call for assistance, Rodday drove up onto the sidewalk in front of the men. He got out of the cruiser and ordered the men to stop. When additional officers arrived, Rodday walked back to where the shiny object had been thrown to the ground. He picked up the bank card and verified that the name on the card was that of the son-in-law. The suspects were arrested, advised of their Miranda rights, and searched. A red kangol hat was taken from the defendant Rogers,[8] a silver calculator and $300 in brand new twenty dollar bills with consecutive serial numbers were taken from the defendant Clemenson, and a yellow AM/FM

---

sume that the judge's determination of credibility was adverse to the losing party, the defendant"). Moreover, one of the officers at Marlborough Street testified at both the hearing and the trial that he used his walkie-talkie and "broadcasted over the air," that is, to "all the cars out on the street, as well as the dispatcher," the victim's description of her assailants, which included reference to an Hispanic male who was the smallest of the three men. The motion judge's ruling implies that she accepted the testimony of the officers. See *Commonwealth* v. *Lanoue,* 392 Mass. at 586 n.2.

[8]Rodday explained that a kangol cap is a "cloth, almost like a felt-type soft cap that has a brim that comes down."

Sony Walkman radio was removed from the defendant Aguilar's head.[9]

There is no dispute that the victim and her son-in-law provided the information heard by Rodday over his radio prior to the time he pulled up onto the sidewalk and ordered the defendants to stop. See *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 56 (1974); *Commonwealth* v. *Fraser,* 410 Mass. 541, 545-546 (1991). Notwithstanding the defendants' insistence to the contrary, we deem it established that that information included the facts that one of the assailants was Hispanic and that he was the shortest of the three men. See note 7, *supra.*

For purposes of decision, we accept the defendants' assertion that there was a seizure the moment Rodday pulled up onto the sidewalk and ordered them to stop. See *Commonwealth* v. *Cao,* 419 Mass. 383 (1995). If at that moment Rodday was conducting a *Terry* stop, see *Terry* v. *Ohio,* 392 U.S. 1, 20-22 (1968), the stop was justified because he "had a reasonable suspicion, based on specific, articulable facts and reasonable inferences, that the defendant[s] had committed, w[ere] committing, or w[ere] about to commit a crime." *Commonwealth* v. *Willis,* 415 Mass. 814, 817 (1993), and cases therein cited. The justified stop was followed by the lawful retrieval of the discarded bank card. See *Commonwealth* v. *Battle,* 365 Mass. 472, 475-476 (1974); *Commonwealth* v. *Wooden,* 13 Mass. App. Ct. 417, 420 (1982). After Rodday verified that the card belonged to the son-in-law, there was probable cause to arrest the defendants, see *Commonwealth* v. *Santaliz,* 413 Mass. 238, 241 (1992), and to search them incident to the arrests. See *Commonwealth* v. *Brillante,* 399 Mass. 152, 154-155 n.5 (1987).

Our conclusion that the searches were lawful does not change even if the seizure is deemed to constitute an arrest rather than a *Terry* stop. See *Commonwealth* v. *Willis,* 415 Mass. at 819-820. The only additional information that Rodday learned subsequent to pulling up onto the sidewalk and

[9]After the crimes, the son-in-law discovered that, in addition to his bank card, his calculator and Sony Walkman radio had been taken.

ordering the men to stop was that the shiny object thrown to the ground was in fact the son-in-law's bank card. We conclude that Rodday had probable cause to arrest the defendants even in the absence of knowledge of that potent fact. Rodday knew that a bank card had been taken by three men; three men were at a bank machine at 4 A.M., a short time after the crime; the bank was about eight blocks from the crime scene; each of the three men fit the descriptions of the assailants; while in the bank foyer, one of the men saw Rodday watching them; when Rodday followed the suspects, one of them threw a shiny object to the ground. "Probable cause does not require a showing that the police resolved all their doubts. 'What had to be shown was more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt.' *Commonwealth* v. *Bond*, 375 Mass. 201, 210 (1978)." *Commonwealth* v. *Hason*, 387 Mass. 169, 175 (1982). See also *Commonwealth* v. *Santaliz*, 413 Mass. at 241. As there was probable cause to arrest, the searches that followed were lawful. See *Commonwealth* v. *Brillante*, 399 Mass. at 154-155 n.5.

b. *The identifications.* Once the victim and her son-in-law, who was trying to quiet his crying daughter, were in the ambulance, the police said that they had three suspects that they wanted the victim to see. When the police van arrived with the defendants, it parked about twenty-five feet ahead of the ambulance facing in the opposite direction so that its rear doors faced those of the ambulance. There were at least four officers standing about the ambulance and the van. The three suspects were taken out of the van and then each was separately brought to the rear windows of the ambulance. Some witnesses remembered the suspects being in handcuffs, others did not.

None of the several officers who testified at the hearing could remember the victim's exact statments concerning her identification of the suspects. They all testified that she said words to the effect that "I think that's them," "It looks like them," and "Could be, looks like him." Two of the officers

were more intent upon listening to an inculpatory statement being made by the defendant Rogers, as will be discussed below.

It was the victim's testimony, however, that although she could not remember exactly what she told the police when she saw each of the three men, she could remember that she recognized two of them, the two who had raped her, the defendants Rogers and Aguilar. She testified that when the men had told her to keep her eyes closed, she had looked at them whenever she was flicked with a knife, during the rapes, and as she was being dragged to her son-in-law's room. She also testified that even though she told the police that she could not identify the third man based upon what she saw of him in the apartment, she was "pretty sure" about him. She explained: "I would have been positive, I think, if there hadn't been so much noise inside the ambulance and my own state at that point."

When the son-in-law, who was seated further back in the ambulance trying to calm his hysterically crying daughter, was asked if he recognized any of the men, he could not do so. Additionally, because he was tending to his child and not listening to the victim, he did not know what she told the police upon seeing each of the men.

"In order to suppress identification testimony the defendant[s] must show that the procedures employed, viewed in the totality of the circumstances, were so unnecessarily suggestive and conducive to mistaken identification as to deny the defendant[s] due process of law." *Commonwealth* v. *Leonardi*, 413 Mass. 757, 760-761 (1992). The one-on-one confrontation was conducted promptly, see *Commonwealth* v. *Barnett*, 371 Mass. 87, 92-93 (1976), and without suggestive statements by the police. Even had the victim been informed that the men were suspects (she testified that the police said only that they wanted to determine whether she could identify three people), she would have been hard put not to realize that the men were suspects. See *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. 574, 583 (1984) ("The witness knows he would not be asked to make an identification unless the po-

lice had reason to suspect the detainee's involvement"). Compare *Commonwealth* v. *Harris*, 395 Mass. 296, 299 (1985) ("Some elements of suggestiveness are inherent in all such confrontations. The police officer's statement to the victim that they would be bringing someone in who matched the description she had given was not so suggestive as to make the confrontation unfair.")

Moreover, even if the police presented the suspects wearing handcuffs (the victim testified that she did not remember seeing any), we would not deem that procedure, in light of the totality of the circumstances, so unnecessarily suggestive as to require suppression of the identification. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 479 (1980), where no special element of unfairness was found in the identification of the defendant as he sat in a police station detention cell. Nor do we think it impermissibly suggestive to have shown the victim the three suspects "together." It is clear from the victim's testimony in its entirety, that even if at some point she saw the suspects standing "together," she nonetheless looked at each individually, irrespective of whether they were brought forward as a group or, as the officers testified, one by one.[10]

Notwithstanding the possibility of some inherent suggestiveness in the victim's one-on-one confrontation of the defendants, there are numerous factors which attest to the reliability of her identification of them. There was sufficient opportunity for the victim to observe two of the three men during the very commission of the rapes, and the lighting was adequate. See *Neil* v. *Biggers*, 409 U.S. 188, 200-201 (1972); *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. at 578-579, and cases therein cited. Prior to the show-up, she had given a general description of the assailant she had the least opportunity to observe and whom she declined to identify. On the other hand, the victim had provided the police with

---

[10]Additionally, the son-in-law testified that, although he was busy with his daughter while the men were being shown to the victim, he "assum[ed]" that they were shown to her in the same manner as to him, that is, "separately."

greater details concerning the two men who raped her and who she stated she recognized at the confrontation. See *Commonwealth* v. *Moon*, 380 Mass. 751, 756-757 (1980). When the suspects were apprehended on the basis of her descriptions, they were in possession of items taken from the son-in-law. See *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. 581-582. On these considerations, we conclude that there was no error in the denial of the motions to suppress the victim's extrajudicial identifications.

c. *Rogers's statement.* When the police arrested the defendant outside the bank, they gave him his Miranda warnings. While at the show-up on Marlborough Street, he indicated he wanted to make a statement. Miranda warnings were again given before the defendant stated: "I did the B & E but I didn't do the rape. The other two did the rape. I was in the room with . . . [the son-in-law]." After making this statement, which, as will be seen below, the Commonwealth did not offer in evidence at trial, the defendant was brought to the police station and again, given his Miranda warnings. He said that he wanted to talk with the officers and essentially repeated his earlier admission.

Almost ten hours after his arrest, the defendant was brought to another part of the police station, the identification unit, for fingerprinting. Although the defendant had been fingerprinted at the time of his booking, this second process was more extensive and included palm and hand prints. In the course of this additional process, the defendant asked the identification unit officer, "Why all these fingerprints?" The officer responded that the police "might have some prints at the apartment pertaining to the case evidently and we want to see if we can match any other prints to your prints." Then came the statement here in issue: "What for? They already know that I was in the apartment." The defendant advances several grounds for his claim that the statement should have been suppressed.

Contrary to the defendant's assertion, *Commonwealth* v. *Mahnke*, 368 Mass. 662, 686 (1975), cert. denied, 425 U.S. 959 (1976), does not require suppression of that statement.

There the court explained: "The cat-out-of-the-bag line of analysis requires the exclusion of a statement if, in giving the statement, the defendant was motivated by the belief that, after a prior *coerced* statement, his effort to withhold further information would be futile and he had nothing to lose by repetition or amplification of the earlier statements. Such a statement would be inadmissible as the direct product of the earlier *coerced* statement." (Emphasis supplied.) See also *Commonwealth* v. *Smith*, 412 Mass. 823 (1992). The defendant does not and cannot argue that his earlier statements, "I did the B & E but I didn't do the rape," were coerced or otherwise illegally obtained. We see no logic in the defendant's claim that the cat-out-of-the-bag line of analysis is nonetheless applicable to the subsequent statement because the Commonwealth failed to offer the earlier voluntary admissions in evidence.

Even were we to assume that the thrice-given warnings of less than ten hours past were not sufficient to advise the defendant of his rights at the time of the extensive fingerprinting process, compare *Commonwealth* v. *Silva*, 388 Mass. 495, 502-503 (1983), we would have no basis for concluding that the statement should be suppressed. "The defendant's statements made directly to a police officer were not solicited and, therefore, were admissible. See *Commonwealth* v. *Lanoue*, 392 Mass. [at 588]; *Commonwealth* v. *Doucette*, 391 Mass. 443, 449 (1984)." *Commonwealth* v. *Trigones*, 397 Mass. 633, 643 (1986).

Nor do we see anything in the second and more extensive fingerprinting process or in the officer's response to the defendant's inquiry about that process which would lead us to conclude that the defendant was subjected to the "functional equivalent" of express questioning. See *Rhode Island* v. *Innis*, 446 U.S. 291, 300-301 (1980). Although there is fleeting reference in the transcript to the fact that additional prints were taken pursuant to a court order, there is nothing that explains when, how, or why the order was obtained. The process did not become interrogation simply by reason of the order. See *Commonwealth* v. *D'Entremont*, 36 Mass. App.

Ct. 474, 479 (1994) (officer's statement of availability should the defendant want to talk was "neither confrontational nor inquisitional"). Compare *Commonwealth* v. *Rubio*, 27 Mass. App. Ct. 506, 511-514 (1989) (showing of cocaine found in the defendant's apartment to him while he sat in kitchen chair surrounded by police was the equivalent of asking him whether it was his).

During trial, the defendant argued that he was entitled to another hearing concerning the voluntariness of the statement, and testimony substantially similar to that presented at the suppression hearing was presented. In claiming that his statement was not voluntarily made, the defendant pointed to the facts that he was booked at 5 A.M., interrogated, and then, at about 1:30 P.M., subjected to an unusual fingerprinting process. At the conclusion of that hearing, the trial judge specifically found that the statement was "totally unsolicited," that it was not the product of police "coercion or overreaching," and that it was made "by an adult person in apparent full possession of his faculties." Simply put, we see no basis in the evidence which would have permitted the conclusion that the defendant's statement was involuntary.

3. *Rogers's motion to sever.*[11] After their arrests, both Rogers and Aguilar made statements inculpating themselves and each other. As earlier noted, Rogers said, "I did the B & E but I didn't do the rape. The other two did the rape." Aguilar first told the police that Rogers and Clemenson forced him to rape the victim but later asserted that the victim had consented to intercourse with him. When the Commonwealth represented that it did not intend to use these statements, the trial judge denied the defendants' motion to sever. See *Bruton* v. *United States*, 391 U.S. 123 (1968).

It is Rogers's contention that resolution of the *Bruton* issue did not obviate the need for severance. He argues that because there was evidence to show that the victim was raped by two of three men, each defendant necessarily had to say that the other defendants were the rapists. See *Common-*

---

[11]Although Aguilar also sought severance, he does not argue this issue on appeal. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

*wealth* v. *Moran*, 387 Mass. 644, 659 (1982), holding that severance should have been granted under Mass.R.Crim.P. 9(d)(1), 378 Mass. 859 (1979), where the "only realistic escape for either defendant was to blame the other." The defendant further claims that although severance should have been granted at the outset, his right to a separate trial became all the greater after the defendant Clemenson pleaded guilty in the middle of trial. There was, however, no renewal of the motion to sever by the defendant, and the sole question before us is whether at the time of the ruling on the motion, the necessity for severance had been firmly established. *Commonwealth* v. *Moran*, 387 Mass. at 659-660.

We begin by noting that it is not accurate to state that the Commonwealth's theory of guilt was simply that the victim had been raped by two of the three defendants. Rather, the Commonwealth's position from the outset was that the victim had been raped by, specifically, Rogers and Aguilar and that Clemenson's liability was as a joint venturer. Although the victim's ability and opportunity to identify the men in the apartment was challenged on cross-examination, she was particular and steadfast in her testimony that she was raped first by the defendant Rogers and then by the defendant Aguilar and that it was the very rapes which provided her with a greater opportunity to observe them than the defendant Clemenson. Compare *Commonwealth* v. *Moran*, 387 Mass. at 659, where the evidence showed that "at least one defendant, but not necessarily both of them, robbed and killed" the victim. The evidence in the instant case cannot be viewed as "creating 'a danger that the jury will feel compelled to choose between defendants rather than to assess the proof against each defendant separately.' " *Commonwealth* v. *Cordeiro*, 401 Mass. 843, 853 (1988), quoting from *Commonwealth* v. *Moran*, 387 Mass. at 659. See also *Commonwealth* v. *Mahoney*, 406 Mass. 843, 849 (1990).[12]

---

[12]It follows from this conclusion that the result would be no different even had the defendant Rogers renewed his motion for severance at the time of the defendant Clemenson's plea.

As an additional claim of prejudice, Rogers argues that the joint trial deprived him of the benefit of his statement, "I did the B & E but I didn't do the rape . . . [t]he other two did," which, he argues, would have explained his subsequent inculpatory remark, "They already know that I was in the apartment." This claim, however, was never raised by Rogers in arguing his motion for severance. Rather, he moved for severance on the grounds of antagonistic defenses, see *Commonwealth* v. *Moran, supra,* and the inculpatory statements made by the defendant Aguilar, see *Bruton* v. *United States, supra.* "In such circumstances the test is whether there was an error that created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Dias,* 405 Mass. 131, 137 (1989)." *Commonwealth* v. *Viriyahiranpaiboon,* 412 Mass. 224, 230 (1992).

Use of this statement at trial would have been inconsistent with Rogers's trial strategy. In his opening statement which immediately followed that made by the Commonwealth, counsel for Rogers announced his theory of defense to the jury: there was no evidence connecting him to any of the crimes and the case was one of mistaken identification. Cross-examination of the Commonwealth's witnesses was devoted to the victim's ability and opportunity to observe her assailants, the accuracy of the transmission of her descriptions of them to the arresting officers, and her identification of them at the show-up. The defendant's inculpatory statement at the time of his second fingerprinting, "They already know that I was in the apartment," was characterized and construed in closing argument as a normal response of someone who had been mistakenly identified and wrongfully arrested, that is to say, if the police were so smart and knew that he was in the apartment, then why did they need all the fingerprints?

Further, the record does not support the defendant's assertion that the statement was exculpatory. There was an abundance of evidence to show that Rogers was one of the three assailants. In addition to the previously recited evidence, there was testimony from a resident of a building adjacent to

the Marlborough Street apartment that at about 3:30 A.M., on the morning in question, he saw a black male wearing a red hat, see note 8, *supra* and accompanying text, jump over his back wall and run across his courtyard. Even accepting Rogers's assertion that the victim's identification of him as one of the two rapists was weak or mistaken, his statement admitting to his presence in the apartment but denying his rape of the victim could not be helpful to his defense under any circumstances. When that statement is considered with the evidence in its entirety, it inculpates him as a joint venturer in the rape. We conclude that, even though the joint trial precluded Rogers from putting his statement to any use, the trial judge's denial of the motion to sever did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Best*, 381 Mass. 472, 488-489 (1980); *Commonwealth* v. *Smith*, 418 Mass. 120 (1994).

*Judgments affirmed.*