Cowin, J.
The defendant, Dennis Jordan, is charged with murder (G.L.c. 265, s.l) and unlawful distribution of a controlled substance, class B, cocaine (G.L.c. 94C, s.32A(c)). He has moved to suppress in-person and photographic identifications of him as well as statements that he made to the police after the murder. He claims that the police acted improperly in detaining him for the original show-up; that the show-up and subsequent photo identification of him were suggestive and that his statements were the product of an unlawful arrest and illegal detention.
A hearing was held on May 3 and May 4, 1995 at which Brockton Officers Clifford Hunt, Stephen Pierce and Walter Callahan; State Trooper William Barrett and the identifying witness Melinda Robinson testified.[1] Further hearings were held on May 31, June 1 and July 11, 1995. After the hearings, receipt of further memoranda from the parties and evaluation of the credibility of the witnesses, the Court allows the motions to suppress the in-person and photographic identifications and denies the motion to suppress the statements.
FINDINGS OF FACT
Melinda Robinson is an eighteen-year old senior in high school who lives at home with her mother. At the time of the events in this case, she and her mother lived on Ellsworth Street, near the corner of Arlington Street in Brockton. The homes on the street are triple-deckers and Ms. Robinson’s home on Ellsworth Street is just one house-length from Arlington Street. Ms. Robinson’s porch faces the comer of Arlington Street and there is a clear view of the Arlington Street corner from Ms. Robinson’s porch.
On May 29, 1993, at 3:45 p.m., when she was on the second-floor porch of her home, Ms. Robinson observed a red station wagon drive up Ellsworth Street past her house. She saw the car turn left at the corner onto Arlington Street and park, clearly in her view. She could see that there were three people in the car, two in front and one in back. She saw one young man get out of the car from the driver’s seat and run down Ellsworth Street away from her. This person was the victim in this case, Errol (“J.R.”) Grinion. Ms. Robinson then saw a person she knew, Jeffrey Williams, get out of the back of the car. A third person, later identified as the defendant, Jordan, emerged from the front passenger seat.
Ms. Robinson heard the victim, Grinion, say: “No,” and she saw him start to run. She also heard Jeffrey Williams say: “Get him, nigger” to Jordan. She watched as Jordan pulled a silver gun from his pants with his right hand and shoot Grinion. Grinion moaned: “A-ah” and Jordan and Williams ran behind a house.
Both Jordan and Williams were dressed in black “hoodies” (hooded sweatshirts) and black pants. The strings at the necks of the hoodies were pulled tight. Jordan was also wearing sunglasses, so that only his nose and mouth were visible. His hair and his chin were covered by his “hoodie.”
Ms. Robinson knew Williams from school and from seeing him in the neighborhood. She never spoke to him because he “gets in a lot of trouble.” Williams does not know her.
After the events above-described, the police were at the scene within approximately five minutes. Ms. Robinson spoke with them and told them what she had witnessed and that she knew that one of the men was Jeffrey Williams. She said that she had never before seen the man who was the shooter. She described both Jeffrey Williams and the unknown assailant as black males about fifteen to sixteen years old[2] and said that Williams was about 5’ 6" tall and that the other young man was about 5’ 7" tall. She also described the men’s clothing to the police.
Officer Stephen Pierce of the Brockton Police responded to the area of the shooting at about 4:20 p.m. He was told that the police were seeking two black males, one of whom was Jeffrey Williams. Officer *198 Pierce recalled that the gang unit had previously arrested Williams and had a picture of him at the police station. Pierce left the scene at about 4:30 p.m. to return to the station and obtain the picture. When Officer Pierce was about two blocks from the shooting scene, he saw two black males riding a bicycle. He recognized them from prior arrests. One was Jeffrey Williams whom Ms. Robinson had stated was involved in the murder. The other young man was Dennis Jordan, the defendant. One of the men was on the handlebars of the bicycle, although the officer does not recall which one. Neither of the men was wearing a black hoodie. Williams was fifteen years old and Jordan was seventeen. Although there was no evidence introduced regarding Jordan’s height,[3] the Court observed that he is approximately the height that Ms. Robinson described. Officer Pierce pulled up next to the two men and they stopped. The officer radioed to his Sergeant that he had stopped Jeffrey Williams and a second parly about two blocks from the scene. He was told to hold the two men there.
A second officer, Officer Ken Gaughan, then pulled up and he and Officer Pierce patted the two men down for the safety of the officers. Officer Pierce told the men that he had information that Williams was possibly involved in a shooting. When Officer Pierce patted Williams down he felt a large bulge in his front pants pocket and pulled out a clear plastic bag of a white rock substance packaged in individual clear plastic packages. The officer believed the substance to be crack cocaine. There was one large rock which sells for about fifty dollars and nineteen bags that sell for about twenty dollars each. Forty-nine dollars was also found on Williams. The amount of drugs on Wiliams is consistent with drug distribution. Nothing of any significance was found on the defendant Jordan during the patdown. Officer Pierce recognized Jordan from prior arrests for stolen vehicles and drugs. Jordan had been using bikes in some of the earlier arrests and had been working with an accomplice at those times. Officer Pierce also knew that it was common practice for adult drug distributors to use juveniles to help sell because the penalties for juveniles are less severe and he was aware that Williams was only fifteen years old. In addition, the area in which Williams and Jordan were stopped is one known for drug distribution. The men were arrested, advised of their Miranda rights from a card which Officer Pierce carries with him and placed in a cruiser. Jordan’s arrest was for conspiracy to violate the controlled substances law.
It had taken Officer Pierce about twenty seconds to drive from the crime scene to the area where he saw the two men. Two or three minutes elapsed from the time that Officer Pierce first saw the defendant and Williams until the time they were placed in the cruiser.
The two suspects were immediately brought back to the scene in a cruiser for purposes of a show-up before Melinda Robinson. This show-up occurred within ten or fifteen minutes of the time that Officer Pierce first stopped the defendant and Williams, less than an hour after the crime was committed, shortly before 4:45 p.m.
Prior to the show-up, Officer Walter Callahan told Ms. Robinson that a cruiser would be coming by with two people and that she should go onto her porch and see if she recognized anyone who got out of the cruiser. If so, she was to rub her head. Officer Callahan did not know who the two men were whom Officer Gaughan was bringing and he did not relay any specific information to Ms. Robinson other than the above directions. No other officer gave Ms. Robinson any other information or instructions about the show-up.
Officer Gaughan’s cruiser stopped almost in front of Ms. Robinson’s house. Williams stepped out of the cruiser, stood outside it and turned around. Jordan then did the same. One of them (it is not clear from the evidence which one) got out of the right rear and the other exited from the left rear. Each man was accompanied by a police officer and each was out of the cruiser on display before Ms. Robinson for about thirty-to-forty seconds. There were a number of other police cars and officers in the area. Officer Callahan watched Ms. Robinson and saw her rub her head. He then went back into her house and asked her if she recognized anyone. She stated that she knew one, Jeffrey Williams, and that the other one was the person who had shot the victim.[4] (Ms. Robinson believed that the two young men were brought back to the show-up in two different cruisers. However, I find this not to be the case.) This show-up occurred within an hour after the shooting, while it was still daylight.
Both the defendant and Williams were taken from the show-up to the Brockton Police Station. Williams was booked at 4:58 p.m. Jordan was not booked until 8:25. p.m.
Detective Clifford Hunt returned to the Brockton Police Station shortly before 5:00 p.m. as he had been informed that Jordan wanted to speak with an officer. Det. Hunt has been a detective for fifteen years and has taken statements from criminal suspects hundreds of times. In accordance with the defendant’s request to speak with an officer, Det. Hunt took Jordan from where he was handcuffed to a pole waiting to be booked to the Detective Bureau on the second floor.[5] As Williams was booked at 4:58 p.m., Jordan was apparently prevented from being booked by being taken to the Detective Bureau to speak with Det. Hunt. He was not booked for conspiracy to violate the controlled substances act until 8:30 p.m. The delay was due in part to the fact that the defendant, at his request, was taken to speak with the police. There was no intentional delay in booking him or in allowing him to make a telephone call. No explanation was provided for why Jordan was not booked for murder at 8:30 p.m.
In Sergeant John Reardon’s presence, Det. Hunt advised Jordan of his Miranda rights by reading them *199 from a rights form. Hunt asked Jordan to read and sign the form. Jordan was sitting at a table in the room and he looked at the form and then signed it. The form was also signed by Det. Hunt and Sergeant Reardon. This form was introduced in evidence and the time of 5:15 p.m. appears on it. Jordan’s signature is on the rights form four times, once each after the questions: “Do you understand what I have read you?” and “Are you willing to talk to me about the case?” His signature also appears after the following statement: “I fully understand my rights mentioned above.” Finally, his signature is at the end of the form following a waiver paragraph.
The defendant was not under the influence of alcohol or drugs. There was a water bubbler and a lavatory on the same floor as the detective bureau.
Det. Hunt told the defendant he was under arrest for drug charges, but that he (the detective) was investigating a murder case. Jordan asked whether, if he gave a statement, he would be charged with the drug offense. The detective answered in the affirmative. Jordan asked a “couple” of other questions and then stated the following. He met Williams on a street and they were planning to get some marijuana. Williams said that he had just shot a dude and that two guns had been involved. The detective asked Jordan if he had been with Williams and Jordan replied: “No.” The detective asked Jordan if he asked Williams who was with him. Jordan answered that he had asked but that Williams would not tell him. Jordan asked Williams about the gun that had been used and Williams answered that he (Jordan) would read about it in the paper. Jordan denied committing any drug offense and he was not questioned about any such activity. Det. Hunt told Jordan that he would be talking with him again after further investigation and that Jordan would be booked on the drug charges. Jordan did not exhibit any reluctance to talk further.
The meeting between the defendant and Det. Hunt lasted about fifteen or twenty minutes. The detective then brought Jordan to the booking desk and left him there.
Jordan was booked at 8:25 p.m. No explanation was provided for why he was not booked immediately after he made the statement to Det. Hunt.
Shortly after the defendant was booked, Det. Hunt and State Police Sergeant Robert Kelleher took the defendant from his cell and brought him upstairs to the room outside the Detective Bureau again. Det. Hunt introduced Jordan to Sergeant Kelleher and told Jordan that the two officers were investigating the murder. Hunt asked Jordan to write out a statement and he agreed to do so. Sergeant Kelleher asked Det. Hunt to have Jordan sign a rights form and Hunt got such a form. The defendant said that it was the same as the form he had already signed and that he had already signed one, but Sergeant Kelleher told Jordan that he wanted him to sign another form. Sergeant Kelleher read the form to the defendant this time and it was then given to the defendant for his signatures. This second form was introduced into evidence and contains the signatures of the defendant in the same four places as the first form. It also bears the signatures of Det. Hunt and State Trooper Kelleher and the time of 8:52 p.m.
This time the defendant was not asked any questions by the officers, but was asked to write out a statement. Sergeant Kelleher remained in the room while the statement was written; Hunt was in and out. The defendant’s signature is at the bottom of the statement and the time of 9:32 is noted. After he wrote the statement the defendant was taken to his cell and told that Hunt would be talking to him again. Once more, no reluctance was expressed by the defendant.
At approximately 3:00 a.m., the defendant was questioned once more, this time by State Police Sergeant Paula Loud and Detective Hunt. This interview took place in the same room outside the Detective Bureau and once again Detective Hunt brought the defendant to the room. Sergeant Loud began to advise the defendant of his rights and the defendant said that he knew them. A rights form was not used this time and it is uncertain whether Sergeant Loud completed reciting the Miranda warnings after the defendant indicated he had already signed two rights forms.
The officers explained to Jordan the status of the murder investigation. They told him that he and Williams were going to be charged and that Williams had already spoken with the police and implicated Jordan. Upon hearing that Williams had implicated him, Jordan became somewhat upset and said: “Then, I’ll tell you what happened.” He began talking, but Detective Hunt told him to slow down because he was taking notes.
This statement differed from the one Jordan had written earlier. Jordan said that he had met up with Williams between 2:15 and 3:00 p.m. on Newbury Street and he had asked Williams if he had “flakes.” Williams told Jordan that he was going to buy some cocaine, a couple of eight-balls. Williams said that he knew where he could get some and beeped someone. He then received a call back and spoke to “J.R.” He was told to meet J.R. at a school on Newbury Street. Williams and Jordan went to the school. J.R. told them to get into his car. Jordan got into the front seat and Williams into the rear seat. They drove around the corner and stopped. J.R. handed Jordan some cocaine and, as Jordan was reaching to give the cocaine to Williams, Williams reached into a bag and pulled out a gun. When J.R. saw the gun, he jumped out of the car and started running. Both Williams and Jordan got out of the car. Williams shot J.R. in the back. Then Jordan and Williams both ran, stopping around the corner.
They ran through a wooded lot to a schoolyard to a white house where they left sunglasses and *200 sweatshirts. The two young men talked about leaving the gun at the white house and the owner said that would be okay. They decided against leaving the gun there, however, as the person at the white house was a “basehead,” always high. The two young men left the white house, talked to some friends, went to another friend’s house to get some marijuana and then to “Tiny’s” house and left the gun there. They told Tiny that if Brian came by to give him the gun. Williams and Jordan then rode on a bicycle to the Newbury Street area where they were stopped by Officer Pierce. Detective Hunt asked how Williams ended up with the cocaine if J.R. had given it to Jordan. Jordan said that he had given the cocaine to Williams at one of their friends’ houses. After the defendant gave this statement he was returned to his cell and was not interrogated further.
On June 4. 1993, Massachusetts State Trooper William Barrett, assigned to the Plymouth County District Attorney's Office, conducted a photo array with Melinda Robinson. Also present were Massachusetts State Trooper DeBuccia, assigned to the Plymouth County District Attorney’s Office, and a Brockton Police Officer. Ms. Robinson was accompanied by her mother.
Trooper Barrett told Ms. Robinson that she was going to see some photos and to indicate if she recognized anyone. She said she understood and was shown two separate arrays. Each array consisted of nine color photos of black males in a page of cut-out spaces. One photo was in each cut-out space. All of the photos are of young black dark-skinned males with very short hair. There is nothing distinctive about any of their features. Only Jordan and one other person are wearing a shirt that appears to be a hooded sweatshirt. (The hood is not covering the head but forms a higher collar than on an ordinary sweatshirt or tee-shirt, the garb of the other men pictured.) Ms. Robinson looked at the first array (designated “A”) and said that she recognized at least two people. She said that A-6 looked like the one who shot the kid and she pointed to A-6. A-6 is a picture of the defendant Jordan. She also said that she knew the person in A-4, but did not know his name.
The second array (designated “B”) was set up similarly and consisted of nine photos of black young men. After viewing that array, Ms. Robinson said she recognized at least two people. She said that B-9 was Jeffrey Williams and that B-7 was someone she recognized from school. There was no evidence that Jordan’s picture was included in this array and I find that it was not.
I find that the totality of the circumstances surrounding the original show-up procedure was suggestive. Melinda Robinson is a young unsophisticated high school student, easily swayed, as indicated by the manner in which she answered questions during cross-examination, i.e., she tended simply to agree with propositions stated to her. The fact that the police brought the defendant back with Jeffrey Williams, whom Ms. Robinson knew had been present at the murder, must have had an effect upon her. In any event, I cannot conclude that it did not impact her identification. In addition, Ms. Robinson was able to see only the nose and mouth of the shooter. His other features were covered by his sunglasses and “hoodie.” Thus, her view of the shooter was an extremely limited one. All the circumstances lead to the conclusion that the identification was a suggestive one.
RULINGS OF LAW
I. The Stop.
The police had sufficient information to stop and detain the defendant in order for a witness to view him for identification purposes. Commonwealth v. Salerno, 356 Mass. 642, 646-47 (1970); Commonwealth v. Crowley, 29 Mass.App.Ct. 1, 4-5 (1990); Commonwealth v. Carrington, 20 Mass.App.Ct. 525-28 (1985). “An expeditious collateral inquiry which might result in the suspect’s arrest or prompt release is not unreasonable when done to meet the practical demands of effective criminal investigation and law enforcement.” Commonwealth v. Salerno, supra at 646-47. The fact that the police brought the defendant back to the scene to be viewed by the witness rather than bringing the witness to the location of the stop is of no significance. Commonwealth v. Crowley, supra.
Here, Officer Pierce stopped the defendant, who was only about two blocks from the crime scene, approximately forty minutes after the murder had occurred. The fact that the two young men were on bicycles meant that they did not have access to a motor vehicle to distance themselves from the crime scene. The defendant was in the company of Jeffrey Williams whom the officer recognized and who had already been identified as one of the two men who had committed the murder. The defendant matched the physical description that Melinda Robinson had provided of the second assailant. See Commonwealth v. Carrington, 20 Mass.App.Ct. 525, 529, n.4 (1985) (where police engaged in cooperative effort, the knowledge of one officer may be attributed to all). In regard to clothing, although both the killer and Williams had been described by Ms. Robinson as wearing black hooded sweatshirts, at the time of this stop neither was wearing such. Since Officer Pierce had been informed that Williams was one of the persons involved in the killing and he obviously had gotten rid of his sweatshirt, it was reasonable for Officer Pierce to conclude that the other assailant would have done likewise in an attempt to conceal his identity. Moreover, both of them were still wearing black pants, as described by Ms. Robinson. The officer clearly had sufficient grounds to detain the defendant for an identification. See Commonwealth v. Gagne. 27 Mass.App.Ct. 425, 426 (1989) (defendant, walking away from crime scene and a short distance therefrom, lawfully detained for iden *201 tification purposes based on victim’s description). Indeed, in the circumstances, it would have been poor police work for Officer Pierce to have neglected to stop the defendant for identification purposes.
There was no probable cause to arrest Jordan on either the drug charge or the murder charge. There is clearly a lack of probable cause for the arrest on drug charges. Simply because the defendant was in a known drug area in the company of a known drug dealer does not provide probable cause for his arrest. See Commonwealth v. Frazier. 410 Mass. 235, 240 (1991). Whether there was probable cause for his arrest for murder is a more difficult question. The line establishing probable cause is often hard to draw. “A person may not be arrested based on mere suspicion and association with another individual, even if there is probable cause to believe that the latter committed a crime.” Id. Moreover, a description equally applicable to a large number of people, without more, may not support a finding of probable cause. Commonwealth v. Carrington, 20 Mass.App.Ct. 525 (1985). In this case, all the police knew about Jordan is that he was within two blocks of the murder scene within an hour of the murder and in the company of someone who was one of two people who had committed the murder. It is not remarkable that Williams, a young black male, would be in the company of another young black man. The police also knew that Jordan matched the description of the second individual involved in the shooting. The description of the second person involved as a black male, fifteen or sixteen, 5’7" is equally applicable to a large number of people. The clothing description (black pants) is virtually meaningless. Dark jeans are the uniform of choice of young men today. Thus, the information the police had about Jordan provided them with nothing definitive to identify -Jordan as apart from virtually anyone with whom Williams was likely to associate.
The cases provide that mere association with a criminal is not enough to establish probable cause and that a general and common description alone is not enough. Here we have both association with a known criminal and a general and common description. The Court has been unable to locate a case, and none has been provided by counsel, in which probable cause turned on those elements alone. Commonwealth v. Rogers, 38 Mass.App.Ct. 395 (1995), cited by the Commonwealth, is distinguishable. Although in Rogers probable cause was found to arrest three men who were together eight blocks from the crime scene shortly after the crime, the men, whom the officer knew had stolen an ATM card, were in an ATM booth at 3:55 A.M. The fact that the men had stolen an ATM card and shortly thereafter were found at an ATM booth near the crime scene at an unusual time for using such a machine places the Rogers’ case on a different footing than the instant one. Indeed, in Rogers, the Court states that probable cause requires “more than a suspicion of criminal involvement, something definite and substantial . . .” The “something definite and substantial” in Rogers was the presence at the ATM machine at an early hour of the morning close to the crime scene. Our case lacks “something definite and substantial” connecting Jordan to the crime.
The present case is closer to the situation in Commonwealth v. Frazier, supra. In Frazier, the police had seen the defendant (a female) in the company of a known drug dealer and the dealer had told a reliable informant that if the dealer were incarcerated, the informant should deal with the defendant. On the day of the arrest, the police followed a car driven by the drug dealer in which the defendant was a passenger. The police saw the dealer (whom they had been told was enroute to a drug transaction) leave the defendant off at a donut shop. The dealer returned shortly to the parking area of the donut shop and signalled to the defendant to come out. The defendant shook her head indicating that she would not come out. After the dealer left the parking lot, the police approached the defendant and asked if the dealer were the person she came with. She responded “no,” thereby lying. The police officer seized the defendant’s handbag which was on a counter and felt a hard object. He unzipped it and found a large amount of a hard object that turned out to be cocaine. The defendant was arrested. The Court held that there was no probable cause to arrest the defendant. If there were no probable cause for the arrest in Frazier, there is no probable cause in the present case. In the present case, the defendant did not lie to the police and there was no direct evidence that he was involved in the murder.[6]
2. The Show-Up.
The burden is on the defendant to establish, by a preponderance of the evidence, that a given confrontation was so unnecessarily suggestive as to give rise to a substantial likelihood of mistaken identification. Commonwealth v. Johnson, 420 Mass. 458 (1995); Commonwealth v. Botelho, 369 Mass. 860, 867 (1976); Commonwealth v. Venios, 378 Mass. 24, 29 (1979).
The test is whether, in light of the “totality of the circumstances,” the identification procedure was unnecessarily suggestive of the defendant. Commonwealth v. Santos, 402 Mass. 775, 781 (1988). Though one-on-one confrontations are inherently suggestive, Commonwealth v. Powell, 10 Mass.App.Ct. 57, 60-61 (1980), “due process rights are not violated when police arrange a one-on-one confrontation between the victim and a suspect promptly after a criminal event occurs.” Commonwealth v. Williams, 399 Mass. 60, 67 (1987). It is immaterial that the identifying witness is not also a victim. Commonwealth v. Freiberg, 405 Mass. 282, 295 (1989). The procedure is justified by the need for efficient investigation in the immediate aftermath of crime and provides a good opportunity for an accurate identification while the witness’s rec *202 ollection or mental image of the offender is still fresh. Commonwealth v. Williams, supra at 67; Commonwealth v. Coy, 10 Mass.App.Ct. 367, 371 (1980).
In this case, the one-on-one confrontation occurred less than one hour after the crime. Such a time period is permissible for a show-up. See, for example, Commonwealth v. McMaster, 21 Mass.App.Ct. 722 (1986). The police said nothing to Ms. Robinson and did nothing to render the show-up suggestive in any way. The confrontation was not rendered impermissibly suggestive because Ms. Robinson was told to look at the men who emerged from the police cruiser. “The witness knows he would not be asked to make an identification unless the police had reason to suspect the defendant’s involvement.” Commonwealth v. Hicks, 17 Mass.App.Ct. 574, 583 (1984); Commonwealth v. Perretti, 20 Mass.App.Ct. 36, 41-42 (1985). The fact that the defendant was seen by Ms. Robinson exiting a police cruiser and accompanied by a police officer is not unduly suggestive. Commonwealth v. Moffett, 383 Mass. 201 (1981); Commonwealth v. Brimley, 20 Mass.App.Ct. 967 (1985); Commonwealth v. Santos, supra at 783-84. However, the fact that Jeffrey Williams was present at the show-up with the defendant renders the identification unduly suggestive. Ms. Robinson knew that Jeffrey Williams was one of the young men at the murder. Bringing the second suspect back with Williams was simply not fair. There was too great a likelihood that Ms. Robinson would identify any young black male in Williams’ company who generally fit the physical description as the second person with Williams. In addition, Ms. Williams did not have adequate opportunity to view the shooter because his face was at least half-covered. These factors make the identification a suggestive one.
Once an identification has been shown to be suggestive, the prosecution may not introduce at trial any later identifications unless they are shown by clear and convincing evidence to have an independent source. Commonwealth v. Johnson, 420 Mass. 458, 463 (1995). The suggestiveness of the original show-up taints the photo identification and any subsequent identification as well. Notwithstanding the fact that Ms. Robinson selected the defendant’s photograph, given the possibility that she saw the defendant’s face for the first time at the unlawful show-up following the crime, the Commonwealth has the burden of proving by clear and convincing evidence that the photographic identification had an independent source. It has not met this burden. No evidence was presented that Ms. Robinson’s identification at the photo array was independent of the original tainted identification. Thus, clearly the Commonwealth has not established by clear and convincing evidence that the photo identification was untainted. The per se rule of exclusion of Commonwealth v. Botelho, 369 Mass. 860 (1976), applies here to exclude the later photo array and any subsequent identification that may be attempted. See Commonwealth v. Johnson, supra.
3. Defendant’s Statements.
Defendant argues that his statements should be suppressed as they were the product of an unlawful arrest and illegal detention at the Brockton Police Station.
Officer Pierce first stopped the defendant at about 4:30 p.m. The defendant was then taken to the Brockton Police Station. He was not booked at all until 8:30 p.m. and the booking at that time was for conspiracy to violate the controlled substances act. The delay was due partially to the fact that the defendant, at his request, was taken to speak with the police. There was no intentional delay in booking him. No explanation was provided for why the defendant was not booked immediately after the interview with Det. Hunt or why he was not booked for murder at 8:30 p.m.
Assuming that the arrest was illegal, the defendant’s statements are nevertheless admissible as voluntary and the product of the defendant’s free will. “The crucial question . . . is . . . “whether . . . the evidence . . . has been come at by exploitation of . . . [the primary] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.’ ” Commonwealth v. Bradshaw, 385 Mass. 244, 258 (1982), quoting from Wong Sun v. United States, 371 U.S. 471, 488 (1963). Whether a confession is the product of free will is determined by examining several factors including (1) Miranda warnings (2) temporal proximity of the arrest and the confession, (3) presence of intervening circumstances, and (4) purpose and flagrancy of the official misconduct. Commonwealth v. Bradshaw, supra at 258, citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975).
Jordan was advised of his Miranda warnings at least four separate times before admitting his presence at the shooting. On two of the occasions he signed a rights waiver form indicating receipt and understanding of his rights. He signed the forms in four places. The defendant was repeatedly advised of his rights, understood them and freely and voluntarily waived them.
The time between the defendant’s arrest (4:30 p.m.) and his initial statement denying involvement in the incident was about forty-five minutes and the statement was made only after the defendant was advised of his Miranda rights a second time. He did not make the statement in which he admitted his presence at the murder until 3:00 a.m., more than eleven hours after his arrest and after being advised of his rights at least four times. The time period between arrest and the first statement, was ample for the defendant to “consider his position.” See Commonwealth v. Shipps, 399 Mass. 820, 829 (1987) (statement of illegally arrested suspect admissible where there was about forty-five minutes between arrest and statement). The time period between the arrest and the second (incul-patory) statement is somewhat more troublesome. *203 That time period was approximately ten and one-half hours. The length of time was certainly enough time for defendant to “consider his position.” Was it so long as to be coercive or to overbear his will? This Court concludes that it was not, although it certainly could be viewed as at the outer limits of a permissible time frame.
As to intervening circumstances, the defendant admitted to being present at the murder only after he was told that Williams had stated that he, Jordan, was the shooter.[7] Thus, it is clear that Jordan’s motive in making his final statement was to implicate Williams and exculpate himself. This is similar to the situation in Commonwealth v. Bradshaw, supra in which the Supreme Judicial Court held that a confession was a direct result of the intervening circumstance (hearing the statement given by another to the police) and not of the illegal arrest.
In regard to the purpose and flagrancy of the police misconduct, one of the main reasons for suppressing statements obtained after improper police conduct is to deter the police from future malfeasance. Commonwealth v. Fielding, 371 Mass. 97, 114 (1976). There was no evidence of any intentional misconduct here. The delay in booking was in part the result of the defendant’s request to speak to an officer. The remaining delay has not been explained, but there was no evidence that it was intentional or for the purpose of depriving the defendant of a constitutional right. Thus, suppressing the statement would not deter future improper police conduct. There was no intentional violation aimed at encouraging the defendant to incriminate himself. Commonwealth v. Shipps, supra at 830.
Accordingly, beyond a reasonable doubt the statements were voluntary and the product of the defendant’s free will. The confession was a direct result of the intervening circumstance of Williams’ statement and not of the arrest itself. Commonwealth v. Bradshaw, supra.[8]
Defendant further argues that the failure to book him even on the narcotics charge until three hours after his arrest deprived him of his right to make a telephone call pursuant to G.L.c. 276, §33A. There is no statutory penalty for violation of said section and confessions need not be suppressed for such a violation when the police do not intentionally deprive the defendant of the telephone call. Commonwealth v. Parker, 402 Mass. 333, 341 (1988). Further, even if statements following a denial of the right to use the telephone might normally be suppressed, the denial in this case was remedied, as it was in Parker, by the giving of the Miranda rights. Defendant was advised of his rights at 5:15 p.m.[9] The rights form that is signed by the defendant in four places and which was introduced into evidence states: “I have been advised I have a right to use the telephone to call an attorney, my family, friends, or to obtain bail.” The form signed at 8:52 p.m. also contains the same statement. Thus, the defendant was aware of his right to make a telephone call. “Although it was error for the police officers not to inform the [defendant] in a timely manner of [his] right to make a telephone call, the error does not warrant suppression of the confessions on the record in this case.” Id.
In his written motion to suppress his statements, the defendant argues that he was not properly advised of his Miranda warnings at the Brockton Police Station. This did not appear to be a live issue at the hearing. To the extent that it is, after Miranda warnings have been given, an individual may knowingly, willingly and intelligently waive his rights and agree to answer questions or make a statement. The statement must also be voluntary. Miranda v. Arizona, 384 U.S. 436 (1966). The Commonwealth has the burden of establishing the validity of the waiver and the volun-tariness of the statements beyond a reasonable doubt. Commonwealth v. Day, 387 Mass. 915, 921 (1983). “The standard to be applied to the defendant’s waiver ... is whether it was knowing and intelligent in light of the totality of the circumstances leading up to the defendant’s .. . statements." Commonwealth v. Carey, 407 Mass. 528, 537 (1990), quoting Commonwealth v. Mandile, 397 Mass. 410, 413 (1986). As stated above, Jordan received his Miranda warnings a number of times. He was not under the influence of any substance. He was sober, coherent, alert and responsive during all the interviews. There was no insistent questioning or any other form of pressure by the police. His free will was never overborne. He indicated at all times that he was willing to talk to the police. He never indicated any reluctance to do so or that he wished to remain silent, Commonwealth v. Taylor, 374 Mass. 426 (1978), or that he wished an attorney, Commonwealth v. Corriveau, 396 Mass. 319 (1985). The defendant stated that he understood his rights several times and he was responsive to the questions asked. Indeed, many of his statements were narrative in form. The defendant’s statements themselves indicate that the defendant was rational and thinking cogently at all times. Both the statements he made were attempts to exculpate himself. At first, he denied any involvement in the murder. In the second statement he was motivated by the desire to shift blame from himself to the co-defendant. Further, his responses to the later recitations of the warnings indicate that he was aware of them and thinking rationally at all times. In light of the totality of the circumstances surrounding the defendant’s statements, all of which are described above, I conclude that Jordan received his Miranda warnings a number of times and that beyond a reasonable doubt he knowingly and intelligently waived his Miranda rights and his statements were voluntary.
ORDER
For the foregoing reasons, the defendant’s motion to suppress the in-person and photographic identifi *204 cations is ALLOWED and the motion to suppress his statements is DENIED.

I t is noted that, at his request, defendant was seated just outside the courtroom during Ms. Robinson’s testimony so that she would not have an opportunity to see him. The courtroom did not have any type of equipment that permitted broadcasting or televising the proceedings to the defendant. However, the courtroom door was kept open and all persons were repeatedly instructed to speak loudly. The defendant indicated that he could hear the proceedings. Any time that he was unable to hear he indicated that fact to a court officer and the problem was corrected.

In fact, the defendant was seventeen at the time, as shown on the booking sheet. There is no question of the defendant’s status as an adult.

The police report which was introduced contains Jordan’s height. This report was introduced, however, solely for the purpose of establishing that Jordan was not a juvenile.

Notwithstanding Ms. Robinson’s statement, this Court concludes that the identification was a suggestive one. See Rulings of Law, ‘The Show-Up,” infra.

Det. Hunt stated that he found Jordan handcuffed to a pole outside the booking area and that he, Hunt, brought Jordan to the Detective Bureau for questioning. Officer Pierce said that he was present when Jordan and Williams were brought directly to the booking area and Jordan was brought immediately to the Detective Bureau. I find that this inconsistency is insignificant and of a type that frequently occurs.

Given the Court’s resolution of this issue, it is not neces-saiy to consider the issue of the validity of an arrest on one charge (drugs) when there is no probable cause to support that charge, but there is probable cause to support a separate charge (murder). See Commonwealth v. Perretti, 20 Mass.App.Ct. 36 (1985).

The police may tell one co-defendant that the other has implicated him. Commonwealth v. Dias, 405 Mass. 131 (1989).

Defendant has not raised any question regarding the truth or falsity of the police statement that Williams had confessed and implicated Jordan. If for any reason that statement is determined to be false, the use of “trickery” here does not invalidate the waiver, which, in light of the other surrounding circumstances, was made voluntarily. If the statement were false, it was made after the defendant had voluntarily and knowingly waived his Miranda rights and chosen to speak with the officers. See Commonwealth v. Edwards, 420 Mass. 666 (1995). Jordan made indisputably valid waivers of his Miranda rights all during the night. See infra. No circumstances existed during the interviews and Jordan possesses no characteristics which would make his statements involuntary. Id.

It appears that 5:15 p.m. is approximately the time at which defendant would have been booked had he not been taken from the booking area to the Detective Bureau in response to his request to speak with a police officer. The co-defendant Jeffrey Williams was booked at 4:58 p.m.